## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CITIZEN DEVELOPER, LLC, | : | Civil No. 1:23-CV-00564 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| SYSTEM SOFT TECHNOLOGIES, INC., | : | |
| | : | |
| Defendant. | : | Judge Jennifer P. Wilson |

## MEMORANDUM

Before the court is a motion for preliminary injunction, filed by Defendant, System Soft Technologies ("SST"). (Doc. 50.) The court finds that SST has not shown that it is in imminent risk of suffering irreparable harm. For this reason, as explained in the following pages, the court will deny the motion for preliminary injunction.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff Citizen Developer ("CD") is a "small technology company" that provides "an easy-to-use, enterprise-grade, no-code development platform so that companies can quickly and securely deploy sophisticated enterprise applications." (Doc. 12, ¶ 8.) Defendant SST is a "global technology company which offers information technology (IT) products, as well as consulting and staffing services." (*Id.* ¶ 11.) On March 30, 2021, the parties entered into a three-year contract, which is documented by the Reseller Appointment Agreement ("RAA") and its exhibits.

Described generally, the contract appointed SST as the exclusive reseller of CD's platform to certain target accounts[1] and gave SST the non-exclusive right to market and sell CD's platform to other prospective accounts. (Doc. 50-7, pp. 7, 8.)[2] SST also committed to spending at least $240,000 per calendar year on marketing CD's platform. (*Id.* at 9.) In exchange, CD agreed to provide training services regarding the platform to SST's employees, and CD also forfeited all of the revenue from those accounts for the term of the contract. (*Id.* at 6, 10.) SST paid $1,289,652 up front for the right to resell CD's platform to the target accounts, which represented the estimated income that CD would have received from these clients during the contract term. (Doc. 58-7, p. 2.)

CD began this litigation by filing a lawsuit against SST on April 3, 2023, based primarily on the allegation that SST breached their agreement. (Doc. 1.) The operative amended complaint was filed on May 4, 2023, and alleges breach of contract, fraudulent inducement to contract, tortious interference with a contract and prospective business, misappropriate of trade secrets, breach of implied contractual duty of good faith, and breach of contract for nonpayment against SST. (Doc. 12.) On May 23, 2023, SST answered the complaint and also brought

---

[1] All of the target accounts are listed in Schedule 1.1 attached to the RAA, but, for the purposes of this motion, the disputed accounts are the School District of Philadelphia ("School District"), Philadelphia Parks and Recreation/MFT ("P&R"), Phoenix Language Services ("PLSI"), and the Pennsylvania Department of Education ("PADOE"). *See* Doc. 50-7, p. 34.

[2] For ease of reference, the court utilizes the page numbers contained in the CM/ECF header.

counterclaims against CD alleging breach of contract and fraudulent inducement. (Doc. 16.)  CD answered the counterclaims on June 12, 2023.  (Doc. 28.)

On October 6, 2023, CD's counsel sent a "Notice of Termination" to SST's counsel indicating that CD was "terminating" the RAA pursuant to 10.2.1(A) and/or Section 10.2.1(B)[3] for SST's breaches of Section 2.6, Section 5.1 of Exhibit C, and Section 1.3 of Exhibit. C.  (Doc. 58-1).  In the letter, CD requested that SST "handle the termination professionally and . . . act in good faith to comply with the terms of the Agreement regarding termination."  (*Id.*)  CD also advised that "CD shall likewise act in a professional manner and abide by the terms of the Agreement. . . .[and] [a]s a show of good faith, CD will agree to honor all contracted licenses."  (*Id.*)

On December 8, 2023, SST filed the instant preliminary injunction, claiming that:

> CD has, among other things: continually threatened and harassed customers (to the point that one customer has expressed that the incessant and inflammatory nature of CD's communications is affecting their mental health); attempted to coerce customers into signing new agreements directly with CD rather than honoring their existing agreements with System Soft; and threatened to shut down customers' access to CD's platform, which would in essence put a stop to their businesses.

---

[3] The court notes that there is no Section 10.2.1(A) or (B) of the RAA, but there is a section 10.2.1(A) and (B) of Exhibit C to the RAA.  Exhibit C is titled the "Reseller Agreement."  This provision deals with termination.  (Doc. 50-7, p. 29.)

(Doc. 50, p. 2.)[4]  The parties then fully briefed the motion.  (Docs. 52, 58, 62, 65.)

After briefing, the court decided to hold an evidentiary hearing.  (Doc. 66.)

At the hearing, SST presented the testimony of Senior Vice President of

Revenue Cal Fuerst.[5]  Fuerst testified that he worked for CD until January of 2021,

when he left to work for SST.  During his time at CD, he developed relationships

with the target accounts at issue here, and CD wished for these accounts to keep

using their platform.  As a result, Fuerst and CD CEO Treff LaPlante came up with

the basics of the RAA during a dinner meeting and agreed that SST would

purchase the exclusive right to sell license blocks of CD's platform to the target

accounts.

Fuerst described some of the terms of the RAA and the practical functioning

of the agreement the parties set up, specifically referencing Section 2.1(a) of the

RAA:

> CD hereby appoints SST as a "Reseller" for the Target Accounts.
> Contemporaneously with the execution of this Agreement, the Parties
> shall each execute and deliver one or more "Orders" in form and
> substance identical to the attached Exhibit B necessary to establish the
> appointment of SST as Reseller to the Target Accounts, at which time

---

[4] On the same day SST filed the motion for preliminary injunction, it also filed a motion for
leave to amend its counterclaims. (Doc. 49.)  The motion was granted, and SST filed amended
counterclaims.  (Doc. 56.)  In its amended counterclaims, SST maintained its breach of contract
and tortious interference claims from its original counterclaims and added a breach of contract
claim based on the October 6, 2023, termination letter and a tortious interference count based on
CD contacting target accounts after the October 6 letter.  (Id.)

[5] In reciting the testimony produced at the hearing, the court relied on its own notes, as a
transcript has not yet been produced.

SST shall assume the rights and obligations as a Reseller for and under the Target Accounts as of the Effective Date. To the extent that the terms and conditions of this Agreement are inconsistent with any terms or conditions of the Reseller Agreement or any Order pertaining to a Designated TA License Block, the terms and conditions of this Agreement shall govern unless the Parties agree, in writing, otherwise.

(Doc. 50-7, § 2.1(a).)[6]  The RAA further provides that, as to the specific license blocks to these target accounts:

(A) CD shall be entitled to all fees and payments that are due prior to the Effective Date, (B) SST shall be entitled to all fees and payments that are due during Term, and (C) allocation of any fees and payments due for any time after the Term shall be governed by the then current standard CD Reseller terms and pricing.

(*Id.* § 2.1(b)(1).)  Moreover, "SST shall be entitled to 100% of all fees paid for and revenue derived from such Designated TA License Blocks (or any renewal thereof) and all Professional Services provided with respect thereto during the Term" with certain enumerated exceptions.  (*Id.* § 2.1.(b)(5).)  Finally, SST relied on the following provision:

During the Term, SST shall have (i) the exclusive right to market and sell the Designated TA Opportunities to the Target Account customers and (ii) the non-exclusive right to market and sell the Platform to the Prospective Account customers. . . CD hereby covenants and agrees not to take any act and not to commit any omission that would be inconsistent with the grant of reseller right provided in this <u>Section 21.(e)</u>.  In the event that CD breaches or threatens to breach any of its obligations under this <u>Section 2.1(e)</u>, monetary damages *may* not be an adequate remedy and, therefore, due to the immediate irreparable actual

---

[6] The court notes that there are multiple copies of many of the exhibits entered into evidence at the hearing.  For ease of reference, the court will cite to a docket number when available.  If the exhibit had not been previously docketed, the court will cite to the exhibit number provided at the hearing.

and substantial harm which *will or may* result from a breach or a threatened breach, SST shall be entitled to seek an immediate permanent injunction against such breach and such other equitable relief, including but not limited to specific performance, to enforce its rights hereunder.

(*Id.* at § 2.1(e) (emphasis added).)

Attached to the RAA is Exhibit C, or the "Reseller Agreement," which

provides:

On the terms and subject to the conditions set forth in the applicable Order and herein, CD appoints Reseller as [CD's] non-exclusive and independent, authorized Reseller of the Platform in the Market during the Term and authorizes Reseller, during the Term, to describe itself in promotional, advertising and marketing materials related to the Platform as an "Authorized Reseller" of the Platform.

(*Id.* at Exh. C, § 1.1.)  Exhibit C describes the details of the resale transaction,

providing:

Additionally, Reseller may resell Platform Licensing when that Licensing (a) is included in an Order between Reseller and [CD], (b) is associated within that Order to an instance of this SKU thereby incorporating this Service Specific Term into the Order, and (c) is being sold solely to End Users within the Market subject to the terms and conditions herein and pursuant to the Order.  For clarity, a valid Order between [CD] and Reseller under this Agreement must include both the SKU containing the Licensing being offered to the End User and an instance of this SKU, both being necessary to designate an approved instance of resale of Licensing to an End User under this Agreement.

Reseller may not authorize or appoint any dealers, sub-resellers, agents, representatives, subcontractors, or other third parties to advertise, promote, resell, or distribute the Platform. During the Term, Reseller shall, in accordance with this Reseller Agreement and at its own cost: ensure that End Users receive, are aware of, and accept the terms and conditions of the EULA before using the Platform License and report

> any actual or suspected EULA non-compliance in writing to [CD] and advertise, promote, market, and distribute the Platform to End Users using Reseller's commercially reasonable efforts.

(*Id.* at Exh. C. § 1.3.)

Fuerst also explained how the CD platform operates. He explained that each client purchases license blocks of the platform which allows them to use a visual interface to create applications specific to their business needs. In this specific relationship between CD and SST, SST sold the license blocks to the client (i.e. the clients paid SST for the license blocks), and then SST serviced the application for the clients to help them achieve their needs. The $1.289 million that SST paid up front to CD represented the expected revenue of the target accounts for the three-year term of the RAA. (*See* Doc. 58-7.)

Fuerst testified there are two "sides" to the CD platform: one for the client and one for "developers." On the developer side, the software developer configures the features of the application to the client's specific needs. When the client and developer are happy, the developer "pushes" the update to the client's side of the application. Fuerst testified that, as of January 2, 2024, CD shut off SST's access to the platform such that its developers cannot "push" new updates to the clients that the clients are requesting.

Fuerst next discussed the current situation for each of the four target accounts at issue. He testified that PSLI's access to the CD platform has been

suspended.  On cross-examination, Fuerst testified that PLSI no longer needs

access because PLSI worked with SST to develop a new platform to serve some of

PLSI's needs.  Fuerst also discussed the PADOE account and stated that SST lost

this account because PADOE signed a contract directly with CD for its license

after December 31, 2023.  Fuerst testified PADOE was "stolen" from SST because

SST had purchased the exclusive right to sell to this client until March 31, 2024,

per the terms of the RAA.

Fuerst next testified that SST and School District have a contract running

from December 1, 2022, until August 31, 2024, for SST to provide a legal case

management system to the School District.  (Doc. 62-3.)  Fuerst explained that this

contract ran longer than the term of the RAA (which expires on April 1, 2024)

because the School District dictates the contract dates.  Fuerst testified about a

letter sent by School District to SST on December 12, 2023, requesting that SST

provide assurances to School District that School District would continue to have

access to the CD platform despite the dispute between CD and SST and CD telling

the School District that their license for the platform will expire after December

31, 2023.  (Doc. 58-5.)  The letter further stated:

> The case management system is an essential tool that School District
> attorneys use to represent their clients.  Absent an assurance, prior to
> close of business on December 18, 2023, that SST will enter into the
> proposed agreement with CD or proof that SST has secured injunctive
> relief preventing CD from restricting the School District's access to
> CD's platform, the School District will have no choice but to terminate

> its agreement with SST and take other measures to secure its access to
> the case management system.

(*Id.*)  Fuerst testified that there had been discussions between SST and CD about allowing School District to extend their license through the end of the RAA period where SST indicated that it was willing to pay additional costs so that School District could have access to the platform.  Fuerst testified that SST was willing to make those payments, but the offer had not been accepted by CD.  CD then entered into evidence emails between counsel showing discussions between the parties to resolve School District's license and showing that CD offered to accept $32,000 to provide valid licenses for School District through August 31, 2024.  Attached to these emails were the appropriate paperwork to finalize this agreement, which was not signed, and the emails also did not show a response from SST's counsel.

When asked how SST had planned to fill the gap between the RAA's end date of April 1, 2024 and the School District's end date of August 31, 2024, Fuerst testified that it would have been SST's intention to enter into a new contract with CD so that SST could sell the license blocks for that period of time, but, absent that, SST could have fulfilled the terms of their contract with School District by providing them another software.  Fuerst testified that this would be expensive and disruptive for School District, but School District and SST are discussing these options.  Overall, SST is concerned that if it fails to comply with its contract with School District, it will be unable to compete for public sector contracts both

because it will be required to disclose that it has previously breached a contract and also because of word of mouth relating a negative experience with SST.

Fuerst also testified to SST's contract with P&R (through subcontractor MFR), which expires on April 1, 2024. Fuerst testified to a document purporting to be SST's request for the appropriate license blocks from June 1, 2023, until March 31, 2024. These were unsigned Docusign emails. (Def. Exh. 9.) Fuerst explained that SST had signed the request and sent it back to CD, but SST never received a counter-signed version. Fuerst has no documentary proof that this occurred. CD contends that P&R has been using the CD platform unlicensed since June 1, 2023.

Fuerst also testified to emails he received on January 30, 2024, from MFR stating that CD told MFR that MFR'S access to the platform will be "turned off tomorrow for non-payment of the software license that we paid you [SST] for last year, so I am not sure how that can be viewed as anything other than a bad situation. Also you still have not given us any assurances that this would not happen." (Def. Exh. 10.) The only assurance that SST has given MFR is that they are seeking an injunction to stop CD from shutting off access to the platform.

Additionally, CD presented emails reflecting discussions between counsel regarding the P&R license block, such that CD would accept $40,000 to rectify P&R's license from June 1, 2023, and extend it until April 1, 2024. These terms

were again not accepted by SST.  Fuerst stated generally that offers from CD to fix the issues with these two clients were unacceptable to SST because the payment amount demanded by CD was arbitrary, and the demands were not accompanied by assurances that SST would have irrevocable access to the platform during the term of the agreement.

Finally, Fuerst summarized SST's requested relief.  SST is seeking a preliminary injunction because, if these accounts choose to terminate their contracts with SST, SST will be harmed in future public sector proposals by having to report that it breached previous contracts and these breaches would damage SST's reputation in the industry leading to loss of referral sources, reputational damage, and loss of goodwill.  Fuerst requested that CD be enjoined from refusing to service bugs in the CD platform and to order CD to restore SST's access to the developer side of the platform, which would not cost CD any money. He testified that SST is also requesting that CD be enjoined from having any contact with the customers at issue until April 1, 2024.

On cross-examination, opposing counsel walked Fuerst through a set of fourteen "orders" relating to the target accounts.[7]  Each order contained a SKU that corresponded to the target account, the terms of the particular order, and was

---

[7] The court notes that "orders" is the term that CD uses for its contracts with entities that purchase licenses for their platforms.

signed by a representative of both SST and CD.  (Pl. Exh. 22.)[8]  Fuerst agreed that this exhibit included the order with P&R that ended on May 31, 2023, and the order with School District ended on December 31, 2023.  Fuerst testified that these orders are what bind the reseller (here, SST) to the specific terms of Exhibit C of the RAA.

Fuerst testified on cross-examination that it would be impossible for P&R and School District to sign a direct contract with CD immediately due to the clients being public entities and having lists of approved vendors.  When asked why SST would not pay the money demanded by CD, Fuerst responded that SST had no assurances that CD would abide by the terms of those additional agreements because CD had previously arbitrarily taken actions against SST and these clients.

Finally, Fuerst testified that between the time of CD's notice of termination and the filing of the motion for preliminary injunction, SST began discussions with the clients regarding the impact of CD's notice and began some platform updates. PLSI and School District both noted they wanted to get their data out of the CD platform, and SST began trying to do so, but was cut off by CD.[9]

---

[8] The court notes that Exh. 22 contains 21 "orders."  However, at the evidentiary hearing, Fuerst testified that only 14 pertained to the target accounts.  Accordingly, the court will only consider those 14 orders.

[9] The parties presented additional evidence regarding issues that bear on the merits of SST's claims against CD.  Because the court will resolve this motion based on the "irreparable harm" element, the court has not included a discussion of this evidence in this opinion.

In its proposed order granting a preliminary injunction, SST requests that: CD refrain from contacting School District, P&R, PLSI, and PADOE in any manner, except for resolving service requests; CD refrain from diverting business or interfering with SST's contractual relationships with School District, P&R, PLSI, and PADOE; CD refrain from taking "any action" that is "inconsistent" with the RAA; CD be prohibited from refusing or failing to address bugs in the platform for School District, P&R, PLSI, and PADOE; CD be prohibited from attempting to sign a service agreement with any SST client or School District, P&R, PLSI, and PADOE; and that CD be prohibited from preventing SST from servicing its clients through the platform.  (Doc. 50-19.)

## JURISDICTION AND VENUE

The court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because CD is a citizen of Pennsylvania with its principal place of business in Pennsylvania, and SST is a citizen of Florida with its principal place of business in Florida.  The amount in controversy exceeds $75,000.  Venue is appropriate under 28 U.S.C. § 1391(b)(3) because CD is subject to personal jurisdiction in this district.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 65 allows a district court to enter a preliminary injunction. To obtain a preliminary injunction, a plaintiff must

establish: (1) that they are likely to prevail on the merits of the case; (2) that they would suffer irreparable harm if preliminary injunctive relief were denied; (3) that the harm defendants would suffer from the issuance of an injunction would not outweigh the harm plaintiffs would suffer if an injunction were denied; and (4) that the public interest weighs in favor of granting the injunction. *Holland v. Rosen*, 895 F.3d 272, 285–86 (3d Cir. 2018) (citing *Del. Strong Families v. Att'y Gen. of Del.*, 793 F.3d 304, 308 (3d Cir. 2015)). The first two factors are "gateway factors": if the plaintiffs have not established those factors, the court need not consider the last two factors. *Greater Phila. Chamber of Commerce v. City of Phila.*, 949 F.3d 116, 133 (3d Cir. 2020) (quoting *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017)). If the plaintiffs do establish the first two factors, "[t]he court then determines 'in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief.'" *Id.* (quoting *Reilly*, 858 F.3d at 179).

A party seeking mandatory injunctive relief that would alter, rather than preserve, the status quo, "must meet a higher standard of showing irreparable harm in the absence of an injunction." *Bennington Foods LLC v. St. Croix Renaissance, Grp., LLP*, 528 F.3d 176, 179 (3d Cir. 2008) (citing *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 33–34 (2d Cir. 1995)). To obtain a mandatory injunction, the party seeking such an injunction must show "a substantial

likelihood of success on the merits and that their 'right to relief is indisputably clear.'" *Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 320 (3d Cir. 2020) (quoting *Trinity Indus., Inc. v. Chi. Bd. & Iron Co.*, 735 F.3d 131, 139 (3d Cir. 2013)).

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Benisek v. Lamone*, 138 S. Ct. 1942, 1943 (2018) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)).  Thus, a preliminary injunction should only be awarded in the "limited circumstances" where "the movant, by a clear showing, carries the burden of persuasion." *Holland*, 895 F.3d at 285. Ultimately, the decision of whether to issue a preliminary injunction is left to the sound discretion of the district court.  *Pennsylvania v. President of the United States*, 930 F.3d 543, 565 (2019) (citing *Winter*, 555 U.S. at 24).

## DISCUSSION

In its brief in support of its motion for preliminary injunction, SST argues it is likely to succeed on the merits of the breach of contract claim because CD unilaterally terminated the RAA, and this breach has caused SST legal damage. (Doc. 52, p. 12.)  SST also argues that it is likely to succeed on the merits of its tortious interference claim because CD knew SST had contractual relationships with these specific clients, and CD's CEO interfered with these relationships with intent to harm SST by contacting these clients to cause SST embarrassment and

legal jeopardy.  (*Id.*)  SST next argues that it will be irreparably harmed without an injunction because "[a] movant 'faces irreparable harm in the loss of solicited clients.'"  (*Id.* at 13 (citing *Prudential Ins. Co. of. Am. v. Browne*, No. 1:06-CV-0059, 2006 WL 8450239, at * 5 (M.D. Pa. Jan. 12, 2006)).  Finally, SST argues the balance of hardships falls in its favor because CD has already been paid upfront for the target accounts, and public interest weighs in its favor as well because the public interest is served by holding parties to the contracts they willingly enter into.  (*Id.* at 13, 14.)

In its brief in opposition, CD responds mainly to the irreparable harm element, arguing that SST failed to show how it will be harmed and how that harm is incapable of being redressed by monetary damages.  (Doc. 58, p. 18.)  CD also concludes that SST is unlikely to succeed on the merits.  (*Id.* at 20.)  CD also concludes that because "there would be <u>NO</u> adverse consequences to SST <u>without</u> an injunction, <u>and</u> the proposed injunction would be draconian, unconstitutional, and <u>absurd</u>, no such order should issue."  (*Id.*) (emphasis in original).

As the parties devoted little attention to the element of likelihood of success on the merits in their briefing or at the hearing, the court will turn immediately to whether SST has carried its burden of showing it would suffer irreparable harm if the preliminary injunction were not entered in its favor.  The court decides it has not.

In order for a movant to support their burden, they must show that they are "more likely than not to suffer irreparable harm in the absence of preliminary relief." *Reilly*, 858 F.3d at 179.  For a mandatory injunction, the harm must not be "too remote and speculative." *Acierno v. New Castle Cnty*, 40 F.3d 645, 655 (3d Cir. 1994) (citing *Continental Group, Inc. v. Amoco Chemicals Corp.*, 614 F.2d 351 (3d Cir. 1980)).  A movant must make a "'clear showing of immediate irreparable injury,' or a 'presently existing actual threat; [an injunction] may not be used simply to eliminate a possibility of a remote future injury.'" *Id.* (quoting *Continental Group*, 614 F.2d at 358).  In this context, the "irreparable" requirement must be met.  The Supreme Court has held that:

> Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough.  The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

*Sampson v. Murray*, 415 U.S. 61, 90 (1974).  Accordingly, the harm "must be of a peculiar nature, so that compensation in money alone cannot atone for it." *Opticians Ass'n of America v. Independent Opticians of America*, 920 F.2d 187, 195 (3d Cir. 1990).

Turning first to SST's assertion of reputational harm, Third Circuit precedent indicates that "showing some potential harm to reputation is usually insufficient to support a conclusion that irreparable harm exists." *Acierno*, 40 F.3d

at 654 (citing *Morton v. Beyer*, 822 F.2d 364 (3d Cir. 1987)).  To make a showing

of irreparable harm based on reputation injury, there must be some showing of

being "potentially *barred*, not merely impaired, from obtaining employment."

*Morton*, 822 F.2d at 372 n.13 (emphasis in original).  Here, any harm to SST's

reputation or ability to contract with other public entities is, at this point, entirely

speculative and not supported by evidence.  SST's reputational harm is speculative

because, while evidence was presented that SST may have to report any breaches

to future potential public entity clients, the potential breaches can still be avoided.

Fuerst testified that there are other software solutions that SST has considered and

discussed with clients that could fulfill the contracts and avoid a breach.

Transitioning to other software would be time consuming and tedious for the

client, and potentially expensive for SST, but it is an option.  Further, there was no

showing of SST potentially being de-barred because of a breach.  SST may need to

report these breaches on future bids, but any future denial of a bid due to this

reporting is speculative.

Next, moving to SST's argument that it will suffer irreparable harm to its

solicited client relationships, SST relies on one case from this district regarding

restrictive covenants, in which this proposition was undisputed.  *See Prudential*

*Ins. Co.*, 2006 WL 8450239, at *5.  In *Prudential Ins. Co.*, in order to provide

support for the undisputed proposition that irreparable harm arises from disruption

to solicited client relationships, the court provided a string cite of case law for the proposition that, "[u]nder Pennsylvania law, breach of a covenant not to compete resulting in loss of goodwill and interference with customer relations can result in irreparable harm and thus be the basis for injunctive relief." *Prison Health Servs., Inc. v. Umar*, No. CIV.A. 02-2642, 2002 WL 32254510, at *20 (E.D. Pa. July 2, 2002); *see also Prudential Ins. Co. of Am. v. Browne*, No. 1:06-CV-0059, 2006 WL 8450239, at *5 (M.D. Pa. Jan. 12, 2006) (citing *John G. Bryant Co. v. Sling Testing & Repair, Inc.*, 369 A.2d 1164, 1168 (Pa. 1977)).  In its brief, SST does no more than cite to *Prudential Ins. Co.* and makes no attempt to liken the RAA to a restrictive covenant or make any argument that this line of cases bears factual similarity or is otherwise persuasive precedent relevant to the instant dispute.

The record here shows that SST's potential harm is adequately remedied by monetary damages that are quantifiable.  While SST may have prepaid for the right to resell to these clients and made contracts relying on this right, when CD demanded money to solve issues with the target accounts, SST could have paid CD the extra money to solve their immediate problem.  Even if they thought that this "money grab" was wrongful, the money paid is recoverable in the instant underlying contract dispute because SST has a breach of contract cause of action for the October 6, 2023, notice of termination.  Any damages suffered as a result of that alleged breach, such as CD turning off SST's access and then demanding more

money to solve the problem, could later be recovered as damages.  There was no showing that SST was unable to pay this money, just that it was unwilling.

To the extent that SST believed that it would pay CD and then CD would not turn on SST's access, this is again speculative and not supported by the record. The record shows negotiations between the parties regarding a stop gap measure until the end of the RAA term, and also concrete offers from CD to restore license blocks in exchange for a certain amount of money.  Again, if CD continually demanded more money to restore access, such payments would be recoverable as monetary damages in this action.

Additionally, as explained above, any harm to SST's relationships with their clients caused by CD shutting off access to the CD platform could be remedied by SST finding a new product to fulfill their contracts.  SST would have had to do this anyway, as the RAA expires on April 1, 2024, and at least one of the contracts at issue extends beyond that date.  SST has known that CD was dissatisfied with the underlying contract since April 2023, when CD instituted the underlying action. SST had ample time to work with its clients to find them other platform solutions should the contract with CD begin to fall apart.  Indeed, SST was able to provide a new platform solution for PLSI.  Expenditures of time and money in switching to a new product are potentially recoverable as monetary damages.  With respect to SST's assertion of future loss of client goodwill and loss of referral sources, this

assertion is too speculative to meet SST's burden.  Accordingly, SST has failed to show that it would suffer an irreparable harm without issuance of an injunction.[10]  The motion for preliminary injunction is denied.

## CONCLUSION

Because SST has failed to show irreparable harm, the motion for preliminary injunction is denied.  An order follows.

<u>s/Jennifer P. Wilson</u>
JENNIFER P. WILSON
United States District Judge
Middle District of Pennsylvania

Dated: February 12, 2024

---

[10] Because SST has not established the "gateway factor" of irreparable harm, the court is not required to address the remaining factors.  *See Greater Phila. Chamber of Commerce*, 949 F.3d at 133.