**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CITIZEN DEVELOPER, LLC, | : | Civil No. 1:23-CV-00564 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| SYSTEM SOFT TECHNOLOGIES, INC., | : | |
| | : | |
| Defendant. | : | Judge Jennifer P. Wilson |

## <u>MEMORANDUM</u>

Before the court are cross-motions for partial summary judgment filed by

Plaintiff Citizen Developer, LLC ("CD") and Defendant System Soft

Technologies, Inc. ("SST"). (Docs. 115, 121.) In this case, both parties have

asserted breach of contract claims stemming from the Reseller Appoint Agreement

("RAA"), which appointed SST as an exclusive reseller of CD's software platform

to certain accounts and obligated SST to spend at least $240,000 per year

marketing CD's platform. (*See* Doc. 116-1; Doc. 121-3.) In its motion, Plaintiff

CD argues that it is entitled to judgment as a matter of law on its breach of contract

claim because SST cannot prove with admissible evidence that it met the

marketing spend. (Doc. 116, p. 18.)[1] In its motion, Defendant SST contends that

CD's claim for breach of contract fails because CD cannot prove it is entitled to

damages that are not foreclosed by a liability limitation clause contained in the

---

[1] For ease of reference, the court uses the page numbers contained in the CM/ECF header.

reseller agreement, which is attached to the RAA.  (Doc. 122, p. 6.)  Neither party has moved for summary judgment regarding SST's counter claims.  For the reasons that follow, CD's motion will be denied and SST's motion will be granted in part and denied in part.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY[2]

Citizen Developer "owns and operates a computer software no-code development platform" which allows users to "create applications software without traditional computer programming."  (Doc. 132, ¶ 1.)  SST is a "technology company which offers IT products and contracts with companies to resell products and services."  (*Id.* ¶ 2.)  On March 30, 2021, the parties entered into the RAA, which had a term that ran from its effective date, April 1, 2021, until the "third anniversary of the effective date."  (*Id.* ¶ 5, 9) (quoting Doc. 116-1, p. 5.)[3]  Section

---

[2] The court gleans the undisputed facts from Doc. 132, Defendant's response to Plaintiff's statement of material facts and Doc. 133-6, Plaintiff's response to Defendant's statement of material facts, because both of these documents provide the totality of the factual dispute in this case.  Where the same facts are cited in both documents, the court will cite to Doc. 132 for convenience.  In accordance with the relevant standard for deciding a motion for summary judgment, the court relied on the uncontested facts, or where the facts were disputed, viewed the facts and deduced all reasonable inferences therefrom in the light most favorable to the nonmoving party.  *See Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 362 (3d Cir. 2008).

[3] The RAA has been docketed multiple times.  (*See* Doc. 116-1; Doc. 117, pp. 1–36; Doc. 121-3; Doc. 132-12; Doc. 133-1.)  For convenience, the court will cite to Doc. 116-1 when citing to the RAA simply because that is the first docket entry where the document is located.  The court notes that Docs. 121-3 and 132-12 contain signature pages while Docs. 116-1, Doc. 117, and 133-1 do not contain signature pages.

The court also notes that many documents in this case are contained at different document numbers.  As a general rule, the court will refer to each document in the first instance it is filed on the docket.

2.1(a) appoints SST as a "Reseller" to the target accounts, which are identified in schedule 1.1 to the agreement.  (Doc. 116-1, p. 6.)  Section 2.1(a) further provides for execution of "Orders" as attached to the agreement in Exhibit B, which establish SST as a reseller for each of the target accounts.  (*Id.*)  Section 2.1(a) provides: "[t]o the extent that the terms and conditions of this Agreement are inconsistent with any terms or conditions of the Reseller Agreement or any Order pertaining to a Designated TA license Block, the terms and conditions of this Agreement shall govern unless the Parties agree, in writing, otherwise."  (*Id.*)  The Reseller Agreement is also a defined term of the RAA, and is described as follows:

> in each instance, the Platform Reseller Agreement (A8000) attached hereto as <u>Exhibit C</u> (including any amendments or restatements thereof and any modifications thereto) entered into from time to time by and between SST and CD, pursuant to which SST shall act as an independent, authorized reseller of the Platform with respect to one or more Markets.

(*Id.* at 4.)  The RAA also obligates SST, during the Term of the RAA, to "expend no less than $240,000 per calendar year on marketing the Platform[4] in the form of content, webinars, speaking appearances, and campaigns directly in support of the Platform."  (*Id.* at 9.)

---

[4] The Platform is defined as "collectively the full suite of Citizen Developer tools and products including the Admin Platform, Software, the software development tools, the computerized Services and the service administration tools."  (Doc. 116-1, p. 5.)

The RAA also provides, in section 6.4, that "[t]his Agreement (including the document referred to herein) and the Reseller Agreement constitute the entire agreement between the Parties with respect to the matters addressed therein[.]" (*Id.* at 13.)  Section 6.4 further provides "[t]o the extent the terms and conditions of this Agreement are inconsistent with the terms and conditions of the Reseller Agreement, the terms and conditions of this Agreement shall govern." (*Id.*) Additionally, Section 6.14 provides that "[t]he Exhibits and Schedules identified in this Agreement are incorporated herein by reference and made a part of this Agreement." (*Id.* at 14.)

Exhibit A attached to the RAA is titled "License Blocks," and identifies the license blocks that are involved in the RAA.  (*Id.* at 16.)  Exhibit B is titled "Reseller Agreement Order Form" and contains a blank copy of a Citizen Developer order form which, as explained in § 2.1(a), establishes SST as a reseller of the Citizen Developer platform when executed.  (*Id.* at 17–19.)  Exhibit C is titled the "Reseller Agreement" and is a copy of the reseller agreement.  The reseller agreement provides that it contains "[c]ertain specific terms and conditions regarding advertising, promotion, marketing and distribution of the Citizen Developer Properties[.]" (*Id.* at 19.)  Among these terms is a limitation of liability clause, which provides:

> LIMITATION OF LIABILITY.  NEITHER PARTY WILL BE
> LIABLE UNDER OR IN CONNECTION WITH THIS RESELLER

4

AGREEMENT UNDER ANY LEGAL OR EQUITABLE THEORY, INCLUDING BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, OR OTHERWISE, FOR LOST REVENUES OR INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, ENHANCED OR PUNITIVE DAMAGES, EVEN IF THE PARTY KNEW OR SHOULD HAVE KNOWN THAT SUCH DAMAGES WERE POSSIBLE AND EVEN IF DIRECT DAMAGES DO NOT SATISFY A REMEDY. EXCEPT AS EXPRESSLY OTHERWISE PROVIDED IN THIS SECTION 9, TO THE MAXIMUM EXTENT PERMITTED BY LAW, NEITHER PARTY MAY BE HELD LIABLE UNDER OR IN CONNECTION WITH THIS RESELLER AGREEMENT UNDER ANY LEGAL OR EQUITABLE THEORY, INCLUDING BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE) OR STRICT LIABILITY, OR OTHERWISE, FOR MORE THAN THE TOTAL AMOUNT PAID BY RESELLER TO CITIZENDEVELOPER UNDER THIS RESELLER AGREEMENT DURING THE TWELVE MONTHS PRIOR TO THE EVENT GIVING RISE TO THE CLAIM. The exclusions and limitations in this Section 9 do not apply to claims pursuant to Section 8 (Infringement Indemnification) and Section 12 (Confidential Information).

(*Id.* at 27).

Around August 26, 2021, CD began inquiring of SST as to the progress of the marketing spend. (Doc. 132, ¶ 12.) In early 2022, the parties met to discuss various aspects of the RAA. (*Id.* at ¶ 16.) In early 2022, SST employee Eric Leonard began attempting to calculate and track SST's expenditures regarding CD through various methods. (*Id.* at ¶ 18.) In February 2022, SST provided CD with a summary of its marketing spend for year 2021. (*Id.* at ¶ 22.) Throughout 2022, SST provided quarterly summaries as to its marketing spend. (*Id.* at ¶ 24.) SST provided no summaries or other documents for 2023 and 2024. (*Id.* at ¶¶ 31, 35.)

On October 6, 2023, after the initiation of this lawsuit, CD sent a notice of termination of the RAA to SST, effective on November 6, 2023. (Doc. 116-5.)

The parties disagree about the total amount that SST was obligated to expend for the duration of the RAA, due to CD's purported termination of the contract on October 6, 2023. (*See* Doc. 121-6.) The parties disagree as to the effect of this termination. The parties also disagree as to the amount that SST actually expended in order to fulfill this obligation. The parties disagree as to whether CD is entitled to recover damages and the amount of damages CD can recover.

CD initiated this lawsuit on April 3, 2023. (Doc. 1.) On May 4, 2023, CD filed the amended complaint.[5] (Doc. 12.) SST answered the amended complaint on May 23, 2023. (Doc. 15.) After CD sent its termination letter, SST filed counterclaims on December 11, 2023.[6] (Doc. 56.) CD answered the counterclaims on December 28, 2023. (Doc. 61.)

---

[5] The amended complaint contains one count of breach of contract, one count of fraudulent inducement regarding the initial contract, one count of fraudulent inducement regarding 2022 assurances and agreement, one count of tortious interference with a contract/prospective business relationship, one count of misappropriation of trade secrets, one count of breach of implied duty of good faith/best efforts/due diligence to exploit exclusive license, and one count of breach of contract for-non-payment of goods/services. (Doc. 12.) The amended complaint requested an order compelling Defendant to require its users to sign a EULA, compensatory damages, punitive damages, and attorney's fees. (*Id.*)

[6] The amended counterclaims contain one count of breach of contract for changing licensing costs, one count of fraudulent inducement, one count of breach of contract based on the October 6, 2023 letter, and one count of tortious interference.

On December 28, 2023, SST filed a motion for preliminary injunction asking the court to enjoin CD from contacting certain SST accounts, soliciting business from these accounts, and requiring CD to continue servicing bugs with these accounts.  (Doc. 50, pp. 4, 5.)  After a hearing, at which both parties presented evidence, the court denied the motion because SST had failed to show it would suffer imminent and irreparable harm.  (Doc. 76.)  The parties then commenced a tumultuous discovery process, during which the court was called upon multiple times to resolve discovery disputes.  (*See* Docs. 86, 87, 96, 98, 101.)

On conjunction with the filing of the instant motions for partial summary judgment, on November 26, 2024, the parties filed a stipulation in which CD agreed to withdraw counts II, III, IV, V, VI, and VII from its amended complaint. (Doc. 120.)  SST agreed to withdraw counts I and II of its amended counterclaims. (*Id.*)  Therefore, the only claims currently pending are CD's breach of contract claim and SST's breach of contract and tortious interference counterclaims.  (*Id.*) Neither party has moved for summary judgment regarding SST's counterclaims.

On November 19, 2024, CD filed its motion for partial summary judgment and supporting papers.  (Docs. 115, 116, 117.)  SST filed its brief in opposition and response to CD's statement of facts on December 10, 2024.  (Docs. 131, 132.)  CD filed a reply brief on December 27, 2024.  (Doc. 138.)

SST filed its motion for partial summary judgment and supporting papers on November 27, 2024.  (Docs. 121, 122, 132.)  CD filed a brief in opposition on December 18, 2024.  (Doc. 133.)  SST filed a reply brief on January 2, 2025. (Doc. 140.)  With leave of court, CD filed a surreply brief on January 10, 2025. (Doc. 143.)

These cross motions for partial summary judgment are ripe and ready for disposition.

## JURISDICTION AND VENUE

This court has jurisdiction under 28 U.S.C. § 1332 because the parties have complete diversity and the amount in controversy exceeds $75,000.[7]  Venue is appropriate pursuant to 28 U.S.C. § 1391(b)(3) because Defendant is subject to the court's personal jurisdiction due to Defendant's continuous and systematic contacts with Pennsylvania and this District as well as the choice of venue provisions of the RAA.

## STANDARD OF REVIEW

A court may grant a motion for summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute of fact is material if resolution of

---

[7] Plaintiff and its only member are citizens of Pennsylvania.  (Doc. 12, ¶ 3.)  Defendant is a citizen of Florida with a principal place of business in Florida.  (*Id.* ¶ 4.)

the dispute "might affect the outcome of the suit under the governing law."
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is
not precluded by "[f]actual disputes that are irrelevant or unnecessary."  *Id.*  "A
dispute is genuine if a reasonable trier-of-fact could find in favor of the
nonmovant' and 'material if it could affect the outcome of the case."  *Lichtenstein
v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 300 (3d Cir. 2012)).

In reviewing a motion for summary judgment, the court must view the facts
in the light most favorable to the non-moving party and draw all reasonable
inferences in that party's favor.  *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288
(3d Cir. 2018) (citing *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher
Educ.*, 470 F.3d 535, 538 (3d Cir. 2006)).  The court may not "weigh the evidence"
or "determine the truth of the matter."  *Anderson*, 477 U.S. at 249.  Instead, the
court's role in reviewing the facts of the case is "to determine whether there is a
genuine issue for trial."  *Id.*

The party moving for summary judgment "bears the initial responsibility of
informing the district court of the basis for its motion, and identifying those
portions of 'the pleadings, depositions, answers to interrogatories, and admissions
on file, together with the affidavits, if any,' which it believes demonstrate the
absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S.
317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  The non-moving party must then

oppose the motion, and in doing so "'may not rest upon the mere allegations or denials of [its] pleadings' but, instead, 'must set forth specific facts showing that there is a genuine issue for trial. Bare assertions, conclusory allegations, or suspicions will not suffice.'" *Jutrowski*, 904 F.3d at 288–89 (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014)).

Summary judgment is appropriate where the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## DISCUSSION

The court begins this discussion with Defendant SST's motion for partial summary judgment because, if granted, it would dismiss Plaintiff's claims. After resolving SST's motion, the court will turn to CD's motion.

### A. SST's Motion

Broadly, SST asserts that CD cannot recover the only type of damages it has asserted–lost profits–because of a limitation of liability clause contained in the Reseller Agreement.  (Doc. 122, pp. 6–10.)  SST argues in the alternative that any damages CD could recover are limited by the clause.  (*Id.* at 7–11.)  Finally, SST argues CD is precluded from recovering attorney's fees and punitive damages.  (*Id.* at 11–13.)

CD responds that SST has waived the affirmative defense of a limitation of liability clause because it did not adequately plead the defense and CD would be prejudiced by allowing SST to raise it now.  (Doc. 133, pp. 1–7.)  CD also argues that the Reseller Agreement was not integrated into the RAA, and therefore, the limitation of liability clause does not apply to damages incurred from SST failing to meet the marketing spend.  (*Id.* at 7–11.)  Finally, CD argues that there are disputed issues of material fact regarding the Reseller Agreement that preclude summary judgment.  (*Id.* at 11–13.)  Because the issues raised in SST's motion for partial summary judgment are discrete, the court will discuss each issue and the parties' arguments on each issue separately.

### 1.  Waiver of Affirmative Defense

The first issue is whether SST waived the affirmative defense that consequential damages are barred by operation of a contract provision.  CD argues

that SST has improperly raised this affirmative defense during summary judgment. (Doc. 133, p. 2.) CD discounts paragraph 107 of SST's answer as too conclusory to give fair notice of the defense of limitation of liability. (*Id.* at 2, 3.) Paragraph 107 of SST's answer states: "[t]he claims made in this lawsuit and the damages allegedly incurred, if any, are barred in whole or in part by the equitable doctrine of estoppel and/or waiver or by contractual provisions." (Doc. 15, ¶ 107.) CD points to a Third Circuit case which held that a limitation of liability defense was forfeited because of insufficiently specific pleadings. (Doc. 133, p. 3) (citing *In re Frescati Shipping Co., Ltd.*, 886 F.3d 291, 313 (3d Cir. 2018)). CD also asserts that it did not have notice that SST would raise this defense because SST did not "develop" this defense during discovery or motions practice. (*Id.* at 3, 4.)

In furtherance of its argument that SST waived a limitation of liability affirmative defense, CD argues that it has been "severely prejudiced" by SST's failure to raise this defense until summary judgment. (*Id.* at 4.) CD contends that "the question for the court is whether Defendant's failure to raise a defense deprived Plaintiff of an opportunity to rebut that defense or to alter its litigation." (*Id.*) CD contends that it has been prejudiced because it has spent "over $400,000 in Discovery and Motions already and Discovery has been long closed. Plaintiff also gave up several valid claims by Stipulation based on no such Affirmative Defense being pled." (*Id.* at 6.) CD further argues that if this defense had been

sufficiently pleaded, it would have sought discovery regarding the defense. (*Id.*) Finally, CD argues that the "entire exercise" of acquiring experts to opine on damages "might not have been necessary and/or would at least have been different/truncated, <u>if</u> Defendant had pled properly in timely fashion." (*Id.* at 6, 7) (emphasis in original.)

SST argues that it did not waive the affirmative defense because it asserted it in its answer. But, SST also argues that even if it did waive the affirmative defense, CD was not prejudiced because it had the opportunity to respond to the argument through summary judgment briefing. (Doc. 140, pp. 10, 11.)

Generally, a party waives an affirmative defense by failing to raise it in an affirmative defense or responsive pleading. *Charpentier v. Godsil*, 937 F.2d 859, 863 (3d Cir. 1991). However, "a defendant does not waive an affirmative defense if '[h]e raised the issue at a pragmatically sufficient time, and [the plaintiff] was not prejudiced in its ability to respond.'" *Lucas v. United States*, 807 F.2d 414, 418 (5th Cir. 1986)(quoting *Allied Chemical Corp. v. McKay*, 695 F.2d 854, 855-56 (5th Cir. 1983)).[8] To adequately raise an affirmative defense in an answer, a defendant must provide plaintiff with "'fair notice' of the grounds for [the] defense." *Mifflinburg Telegraph, Inc. v. Criswell*, 80 F. Supp. 3d 566, 573 (M.D. Pa. 2015). An affirmative defense can provide fair notice even without specific

---

[8] This standard was adopted by the Third Circuit in *Charpentier*, 927 F.2d at 864.

factual allegations, "as long as the defense is logically within the ambit of the general factual allegations in the litigation." *Id.* at 574. "[T]he plaintiff must be able to infer why an affirmative defense may be germane to the litigation based on some general allegations in the pleadings." *Id.* at 574.

Paragraph 107 of the answer adequately put CD on notice that SST intended to raise an affirmative defense based on contractual provisions. Paragraph 107 provides: "[t]he claims made in this lawsuit and the damages allegedly incurred, if any, are barred in whole or in party by the equitable doctrine of estoppel and/or waiver or by contractual provisions." (Doc. 15, ¶ 107.) Considering there was one set of documents that comprise the contract at issue in this case, this paragraph is sufficient to put CD on fair notice. The fact that SST did not identify the specific contractual provision it intended to rely on is not determinative given that there is only one set of documents at issue here. It is within the logical ambit of the general factual allegations that any defense based on the contract would be contained in that one set of documents. Thus, SST adequately raised this defense in its answer such that it has not been waived.

CD's reliance on *Frescati* is unavailing for the reasons argued by SST. In *Frescati*, the Third Circuit held that a party had not adequately pleaded an affirmative defense when it averred that the claims were barred by "the provisions of the Oil Pollution Act of 1990[.]" *In re Frescati Shipping Co., Ltd.*, 889 F.3d

291, 313 (3d Cir. 2018). The Third Circuit held this averment was insufficient because "[n]oticeably absent from this general averment is any specific citation to the limitation of liability defense or even a description of the nature of the defense. This is significant because the OPA includes a number of potential affirmative defenses." *Id.* Further, the Third Circuit held that the "general reference to the entirety of the OPA did not provide adequate information from which *Frescati* could determine that CARCO was seeking to limit its liability under § 2702(d)." *Id.* Here, on the other hand, SST's averment in its answer is sufficiently specific to put CD on notice that SST intended to limit damages by operation of contractual provisions. There is one set of documents that was attached to the complaint: the RAA and its exhibits. There appears to be a single clause within these documents that references limiting liability or damages, which is the clause that SST now relies upon. Thus, paragraph 107 is not as vague as a reference to a general statutory scheme, as in *Frescati*. Accordingly, this averment was sufficient to put CD on notice that SST may raise this affirmative defense. Because SST properly raised this defense, the court will not examine CD's arguments regarding prejudice.

### 2. Incorporation of the Reseller Agreement into the RAA and Applicability of the Limitation of Liability Clause

Because SST's motion is premised on the limitation of liability clause in the Reseller Agreement, the next issue to address is whether the RAA integrated the

Reseller Agreement such that the terms of the Reseller Agreement became terms of the RAA.  To make this determination, the court begins with basic principles of contract interpretation.  "[T]he goal of contract interpretation is to discover the parties' objective mutual intent." *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 613 (3d Cir. 1995).  Under Pennsylvania law, "courts presume that the parties' mutual intent can be ascertained by examining the writing.  Only where the writing is ambiguous may the factfinder examine all the relevant extrinsic evidence to determine the parties' mutual intent." *Id.*

Accordingly, at the summary judgment stage, "[t]he court can grant summary judgment on an issue of contract interpretation if the contractual language being interpreted 'is subject to only one reasonable interpretation.'" *Emerson Radio Corp. v. Orion Sales, Inc.*, 253 F.3d 159, 163–64 (3d Cir. 2001) (quoting *Arnold M. Diamond, Inc. v. Gulf Coast Trailing Co.,* 180 F.3d 518, 521 (3d Cir.1999)).  Conversely, "[i]t is hornbook law that if the relevant terms in a contract are ambiguous, the issue must go to a jury." *Id.*  A contract is ambiguous "if, and only if, it is reasonably or fairly susceptible of different constructions and is capable of being understood in more senses than one and is obscure in meaning through indefiniteness of expression or has a double meaning." *Capricorn Power Co., Inc. v. Siemens Westinghouse Power Corp.*, 324 F. Supp. 2d 731, 749 (W.D. Pa. 2004)(citing *Samuel Rappaport Family P'ship v. Meridian Bank*, 657 A.2d 17,

21 (Pa. Super. 1995)).  Conversely, "[a] contract is not ambiguous if the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends; and a contract is not rendered ambiguous by the mere fact that the parties do not agree on the proper construction." *Id.*  "The determination whether a contract term is ambiguous is a question of law that requires a court to 'hear the proffer of the parties and determine if there [are] objective indicia that, from the linguistic reference point of the parties, the terms of the contract are susceptible of different meanings.'" *Emerson Radio Corp.*, 253 at 164 (quoting *Sheet Metal Workers, Local 19 v. 2300 Group, Inc.,* 949 F.2d 1274, 1284 (3d Cir.1991.))  This determination requires consideration of "the contract language, the meanings suggested by counsel, and the extrinsic evidence offered in support of each interpretation." *Id.*

When deciding whether the parties intended to integrate all of the terms of the Reseller Agreement into the RAA, the court also considers that "[i]ncorporation by reference is proper where the underlying contract makes clear reference to a separate document, the identity of the separate document may be ascertained, and incorporation of the document will not result in surprise or hardship." *Standard Bent Glass Corp. v. Glassrobots Oy*, 333 F.3d 440, 447 (3d Cir. 2003).  "[T]he parties may incorporate contractual terms by reference to a

17

separate, noncontemporaneous document, including a separate agreement to which
they are not parties, and including a separate document which is unsigned."
*Capricorn Power*, 324 F. Supp. 2d at 749 (citing 11 WILLISTON ON CONTRACTS §
30:25 (Richard A. Lord, ed. 4th ed. 2003)).  Further, "[w]hile discussion of
incorporation by reference is often framed in terms which suggest the complete
absorption of one document into another, it is important to note that where
incorporated matter is referred to for a specific purpose only, it becomes a part of
the contract for such purpose only, and should be treated as irrelevant for all other
purposes." *Id.*

 Turning first to the language of the contract, a few provisions guide the
court's analysis.  The first important language is the description of "reseller
agreement" in both the RAA and the Reseller Agreement.  The RAA describes the
Reseller Agreement as:

> in each instance, the Platform Reseller Agreement (A8000) attached
> hereto as <u>Exhibit C</u> (including any amendments or restatements thereof
> and any modifications thereto) entered into from time to time by and
> between SST and CD, pursuant to which SST shall act as an
> independent, authorized reseller of the Platform with respect to one or
> more Markets.

(*Id.* at 4.)  Important here is that the Reseller Agreement is defined as an agreement
the parties enter into "from time to time." Also important is that the Reseller
Agreement appoints SST as a reseller "with respect to one or more Markets."  This
language limits the reach of the Reseller Agreement.  Second, the definition of the

"reseller agreement" within the Reseller Agreement also limits the reach of the

agreement. The Reseller Agreement states: "'Platform Reseller Agreement' also

'Reseller Agreement' shall mean this agreement as only effective pursuant to an

Order and without an applicable Order this Reseller Agreement is null and void."

(Doc. 116-1, p. 33.) This language again limits the reach of the Reseller

Agreement by making it effective only in connection with an order. Third, the

language of the liability limitation clause directs that liability will only be limited

"under or in connection with *this* reseller agreement…" (*Id.* at p. 28)(emphasis

added). The plain terms of the clause connect the liability limitation to a specific

Reseller Agreement, not a general one. Finally, the RAA does contain a clause

titled "Incorporation of Exhibits and Schedules" which provides "[t]he Exhibits

and Schedules identified in this Agreement are incorporated herein by reference

and made a part of this Agreement." (*Id.* at 14, section 6.14.) One such exhibit is

the Reseller Agreement.

　　　Of the competing constructions offered by the parties, CD's is more

consistent with the terms of the RAA. CD argues that the limitation of liability

term "is <u>not</u> a contract term in the RAA between Plaintiff and Defendant. It is <u>only</u>

a term in a form RA Agreement[.]" (Doc. 133, p. 7)(emphasis in original.) CD

argues that the reseller agreement was "attached as an Exhibit to the RAA as an

exemplar of what agreement Defendant is obligated, by the RAA (¶2.1(a)), to enter

into with Plaintiff for any particular customer to which it licenses the CD Platform pursuant to the RAA." (*Id.*) CD argues the limitation of liability clause in the reseller agreement is inconsistent with the RAA because the RAA contains no such clause. (*Id.*) CD further argues that the limitation of liability clause is contained in the seventeen agreements that SST and CD entered into in the course of the RAA, and these seventeen agreements are "completely independent, different contracts." (*Id.* at 7, 8.)(citing to Doc. 133-5.)

CD also argues that SST has "misconstrued" section 6.14, which purports to incorporate all exhibits, and the Reseller Agreement specifically, into the RAA. (*Id.* at 8, 9.) CD argues that "NONE of these references [to exhibits] in any way, shape or form purport to make any Exhibit a binding contract between the Parties, yet." (*Id.* at 9.) CD argues these exhibits were "clearly incorporated to establish what form of Order and RA had to be used in order to license the CD Platform to any particular customer, an event done by the Parties 17 individual times <u>after</u> the RAA was executed." (*Id.*)

On the other hand, SST relies mainly on § 6.14 to argue that the Reseller Agreement's liability limitation is incorporated into the RAA and applicable in this case. (Doc. 122, pp. 6–8.) SST argues that CD's damages are solely lost profits damages and thus, prohibited under the liability limitation, which bars either party from recovering "lost revenues or indirect, special, incidental, consequential,

exemplary, enhanced or punitive damages[.]"  (*Id.*)  SST discounts CD's argument

that the Reseller Agreement was meant to be an exemplar by arguing that "the

parties have one general Contract that governs the terms and conditions of their

relationship, regardless of the amount of customers who end up purchasing the

platform from SST."  (Doc. 140, p. 4.)  SST further argues that the Reseller

Agreement is "CD's standard reseller agreement" and that while the RAA

contained specific terms regarding the purchase price and the marketing spend, the

parties decided to incorporate CD's "standard" reseller terms by incorporating the

Reseller Agreement.  (*Id.* at 5.)  SST argues that this was the understanding of the

parties because CD relied on specific terms of the Reseller Agreement as bases for

its breach of contract action against SST in the amended complaint.  (*Id.*) (citing

Doc. 12, ¶¶23–25.)

From reading all of the documents together, the RAA does not specifically

incorporate any provisions of the Reseller Agreement, but rather references the

Reseller Agreement and order as examples of the documents the parties were

expected to enter into throughout their relationship for each order.  As noted by

CD, there is no language in the RAA which limits liability in connection with the

terms of the RAA.  *See Sucesion J. Serralles, Inc. v. United States*, 46 Fed. Cl. 773,

786 (2000) (holding that lack of language in one contract referring to specific term

in separate contract was sufficient to show the contracts were closely related but insufficient to show the term had been incorporated).

SST's argument that the Reseller Agreement was incorporated into the RAA in order to provide the specific details of the parties' agreement as reseller is belied by the description of the Reseller Agreement within the RAA. The RAA contemplated the parties entering into a separate Reseller Agreement from "time to time" to set SST up as an independent reseller to a specific market. If the terms of the Reseller Agreement were meant to govern the totality of the parties' relationship, there would not be a need to keep entering into further Reseller Agreements "from time to time." Rather, the RAA sets up the right of SST as reseller to certain accounts, for which the parties must execute orders and the required Reseller Agreements for each specific account and sale. The RAA also obligates SST to spend $240,000/year in marketing the platform, and this requirement is not attached to a specific account or order and Reseller Agreement.

If either party breached a specific Reseller Agreement for a specific account or market, the Reseller Agreement connected with that account or market would limit consequential damages or lost profits resulting from that breach. However, the claim here is not for breach of a specific order and Reseller Agreement but rather, the RAA, which contains the marketing spend obligation. The language of the agreements does not show that it was the intent of the parties to adopt the

liability limitation in the Reseller Agreement into the RAA with respect to the marketing spend obligation.

Although SST argues that the parties intended the Reseller Agreement to govern all other details of their contract not explicitly laid out in the RAA, this is not written in the RAA.  To assume such a provision exists would be to add a provision to the contract, which is not permitted.  *Steuart v. McChesney*, 444 A.2d 659, 662 (Pa. 1982).   It would have been easy for the parties to make such an intention known in the text of the RAA.  However, the parties did not do so, and instead described the Reseller Agreement as an agreement to be entered into by the parties from time to time with respect to certain markets.  Further, the RAA is explicit that if there is any conflict with another agreement, the RAA is to control. It is not obvious or reasonable to include a broad liability limitation in a document that does not control the RAA and is null and void without a signed order attached. *Emlenton Area Mun. Auth. v. Miles*, 548 A.2d 623, 626 (Pa. Super. 1988)("Where a contract may be interpreted in a manner giving effect to all provisions, that interpretation is preferred.")  Additionally, the Reseller Agreement does not prioritize itself if there is a conflict, rather, the Reseller Agreement prioritizes the order.  (Doc. 116-1, pp. 30, 31.)  Accordingly, the limitation of liability clause contained in the Reseller Agreement does not bar CD's breach of contract claim

which seeks to recover lost profits damages.  Therefore, SST's motion for summary judgment will be denied on these grounds.[9]

### 3. Attorney's Fees

SST argues that the court should grant summary judgment in SST's favor on CD's claim for attorney's fees because attorney's fees are generally not recoverable from a breach of contract claim under Pennsylvania law, absent "express statutory authorization, a clear agreement of the parties, or some other established exception."  (Doc. 122, p. 11.)  CD does not respond to this argument in its brief in opposition.

As noted by SST, "[t]he general rule within this Commonwealth is that each side is responsible for the payment of its own costs and counsel fees absent bad faith or vexatious conduct." *Lucchino v. Commonwealth*, 809 A.2d 264, 267 (Pa. 2002).  This general rule "holds true 'unless there is express statutory authorization, a clear agreement of the parties or some other established exception.'" *McMullen v. Kutz*, 985 A.2d 769, 775 (Pa. 2009) (quoting *Mosaica Academy Charter Sch. v. Commonwealth Dep't of Educ.*, 813 A.2d 813, 822 (Pa. 2002)).  Here, there is no contractual provision regarding attorney's fees in the RAA.  (Doc. 116-1.)  CD did not respond to this argument to assert any other basis

---

[9] SST's remaining arguments that CD can only recover $240,000 in damages due to the limitation of consequential damages or cannot recover more than the yearly market spend are denied because they necessarily rely on SST's argument regarding the application of the limitation of liability clause.

for an award of attorney's fees.  Accordingly, CD is not entitled to attorney's fees, and the motion for summary judgment will be granted on this ground.

### 4.  Punitive Damages

Finally, SST argues that punitive damages are not recoverable in a breach of contract claim and ask for summary judgment in its favor regarding CD's request for punitive damages.  (Doc. 122, pp. 12, 13.)  CD does not respond to this argument. "[U]nder Pennsylvania law, 'punitive damages are not recoverable in an action solely based upon breach of contract.'" *Nicholas v. Pa. State Univ.*, 227 F.3d 133, 147 (3d Cir. 2000)(quoting *Johnson v. Hyundai Motor America*, 638 A.2d 631, 639 (Pa. Super. 1997)).  Accordingly, because CD's action is solely based upon breach of contract, CD is not entitled to punitive damages.  The motion for summary judgment will be granted on this ground.

### B.  CD's Motion

Prior to discussing the merits, SST raises two arguments that need to be addressed.  First, SST objects to CD's brief in support because it exceeds the page limitations of the Middle District of Pennsylvania's local rules.  (Doc. 131, p. 5.) SST also objects to CD's allegations of spoliation and discovery misconduct.  (*Id.* at  6.)  SST argues that CD's allegations of discovery misconduct are improper because CD has not moved to compel any allegedly withheld documents, and

spoliation issues are issues of fact, which counsels against granting CD's motion for summary judgment. (*Id.* at 6, 7.)

Regarding CD's overlong brief in support, the court agrees that CD's brief in support of its partial motion for summary judgment exceeded the page limit contained in Middle District Local Rules. *See* Local Rule 7.8 (b)(1)-(2). However, a district court "can depart from the strictures of its own local procedural rules where (1) it has a sound rationale for doing so, and (2) so doing does not unfairly prejudice a party who has relied on the local rule to his detriment." *Advanced Fluid Sys., Inc. v. Huber*, 958 F.3d 168, 181 (3d Cir. 2020) (quoting *United States v. Eleven Vehicles, Their Equipment & Accessories*, 200 F.3d 203, 215 (3d Cir. 2000)). The court will not deny the motion for summary judgment solely due to the Local Rule violation because CD's motion has been fully and thoroughly briefed, and SST does not argue it was prejudiced by CD's lengthy brief.

Regarding the accusations of discovery misconduct, CD has not filed a motion to compel or a motion for sanctions. FED. R. CIV. P. 37. The time for raising discovery disputes and filing discovery motions had long expired by the time CD's motion for summary judgment was filed. (*See* Doc. 79 (setting fact discovery deadline of April 30, 2024).) Further, the court will also not discuss spoliation issues at this time because the court will deny CD's motion based on the multiple genuine issues of material fact that ultimately involve witness credibility.

However, the court will entertain spoliation issues through pre-trial motions should the parties wish to litigate those issues.

Turning to the merits of CD's motion, CD argues it is entitled to summary judgment as a matter of law on its breach of contract claim because SST cannot prove through admissible evidence that it met the marketing spend requirement. (Doc. 116, p. 18.) In a footnote, CD contends that it has established the elements of a breach of contract claim. (*Id.* at 18 n.16.) Then CD argues that SST's claims that it met the market spend are "mere assertions" and insufficient to defeat a summary judgment motion. (*Id.* at 27.) CD discusses what it views as SST's "actual" marketing spend based on the documentary evidence provided and concludes that this evidence shows SST's performance was "inexcusable in law or equity." (*Id.* at 9–13, 22.) CD further argues that SST's failure to meet the marketing spend is supported by "corroborating evidence," such as SST's failure to gain new clients during the life of the contract, SST's failure to produce requested records, and SST's destruction of evidence. (*Id.* at 23–25.) CD asks the court grant "partial summary judgment in the amount of $935,233.33 with the remaining damages to be determined by a jury." (*Id.* at 18.)

In response to the merits of CD's motion, SST asks the court to "deny CD's Motion for Partial Summary Judgment, that CD take nothing from its breach of

contract claim."[10]  (Doc. 131, p. 4.)  SST argues that CD has not shown that it is

entitled to judgment as a matter of law on its breach of contract claim because CD

has not established it is entitled to damages.  (*Id.* at 7.)  First, SST argues CD is not

entitled to expectation damages because "CD was never entitled to any of the

amount that SST was to spend towards marketing."  (*Id.* at 9.)  Second, SST argues

that no reliance or restitution damages exist because the RAA did not require CD

to expend anything in conjunction with SST's marketing spend and "[t]here are no

allegations or evidence that CD conferred $935,233.33 in benefits to SST, or that

SST received any such benefits."  (*Id.* at 10.)

　　　SST also argues that there are genuine issues of material fact regarding the

total amount SST was required to spend per the RAA and whether SST complied

with the marketing spend.  (*Id.* at 11–17.)  Regarding the first issue, SST argues

that it was only obligated to spend $720,000 because SST was not obligated to

market the platform after CD terminated the RAA on October 6, 2023.  (*Id.* at 11.)

Regarding the second issue, SST argues that it has presented more than a scintilla

of evidence that it complied in each year it was required.  For 2021, SST argues

that it has presented the testimony of Eric Leonard, who testified that he, "along

with marketing and operations personnel, reviewed departmental records and

---

[10] A request for affirmative relief or court order must be in a motion, not an opposing brief.  Fed.
R. Civ. P. 7.  The court will not view SST's brief in opposition as asking for entry of summary
judgment against CD, but rather, arguing for denial of CD's motion.

financial data to ensure SST $240,000 marketing spend toward the CD platform."

(*Id.* at 12.)  Leonard reviewed Timekeeper data, work product, and calendars, and

had discussions with personnel which resulted in Leonard estimating a total

number of hours worked by the marketing employees and then multiplied that by

"costs paid by SST for those employees[.]"  (*Id.* at 12, 13.)  SST also explained

why it did not produce certain evidence which CD requested, such as invoices

from tools used by the marketing department and calendars.  (*Id.* at 13.)  SST

pointed to Ashok Yarlagadda's estimate that SST spent approximately twenty-five

percent of its entire marketing budget of $2 million on marketing CD's platform.

(*Id.* at 14.)  SST notes that "CD does not argue that SST failed to market the CD

platform in 2021–which remains undisputed–rather, CD improperly asserts that

SST has not provided documentation to support the basis of the 2021 Marketing

Summary document."  (*Id.* at 13.)

For 2022, SST provided quarterly summaries, which relied on timekeeper

data as well as Leonard's own work in calculating how many hours had been spent

on marketing the platform.  (*Id.* at 15, 16.)  The summary provides a total of

$247,853 spent on marketing.  (*Id.* at 16.)  SST also provided employee salaries as

well as timekeeper data to support this summary.  (*Id.*)  For 2023, SST argues it

provided timekeeper data, and marketing tools and expenses sufficient to show

they met the marketing spend for the portion of 2023 for which they were

obligated to market the platform prior to CD's termination of the contract. (*Id.* at 17.)

In reply, CD argues that the factual issues raised by SST are either legal questions or inapplicable because there is no admissible evidence to support SST's assertion. (Doc. 138, p. 7.) CD does not address the questions it deems "legal" questions but rather spends the rest of its brief discussing the evidentiary objections it has with respect to SST's exhibits. (*Id.* at 8–28.) In summary, CD challenges the summaries provided by SST as inadmissible summaries under Federal Rules of Evidence 1006 and lacking an affidavit or testimony to "link any information therein in any way to CD." (*Id.* at 9.) CD argues many of the exhibits do not reference CD. (*Id.* at 10–12.) CD challenges the personal knowledge of the individuals who testified as well as whether these individuals were testifying as experts. (*Id.* at 16–21.) CD argues that SST made accounting errors or "fabricated" time. (*Id.* at 15, 22–24.) CD attaches its own summary exhibits that point out discovery failures, synthesize SST's accounting errors, and allegedly shows how "fast and easy" it would have been for SST to contact the applications it used and request reports. (Docs. 138-1; 138-2; 138-3; 138-4; 138-5.)

Under Pennsylvania law, to prove a claim of breach of contract, a plaintiff must allege "(1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resultant damages." *City of*

*Allentown v. Lehigh Cty. Auth.*, 222 A.3d 1152, 1157 (Pa. Super. Ct. 2019)

(quoting *Reformed Church of Ascension v. Theodore Hooven & Sons, Inc.*, 764

A.2d 1106, 1109 (Pa. Super. Ct. 2000)).  CD's argument is, essentially, SST cannot

prove that it did not breach the contract because it lacks documentary evidence

proving it met the spend.  SST argues that CD has not met its prima facie burden of

showing it is entitled to damages, and there are genuine issues of material fact

regarding breach.

On the element of breach, the court finds, drawing all inferences in favor of

non-movant SST, that there are genuine issues of material fact regarding whether

SST breached the RAA.  To oppose a motion for summary judgment, the

nonmovant "may not rest upon the mere allegations or denials of the . . . pleading;'

its response, 'by affidavits or as otherwise provided in this rule, must set for

specific facts showing that there is a genuine issue for trial.'"  *Saldana v. Kmart

Corp.*, 260 F.3d 228, 232 (3d Cir. 2001).  SST has provided enough evidence to

create a genuine issue of material fact such that a jury must decide whose evidence

to credit.  CD's main contention is that SST has not provided certain kinds of

evidence showing that it spent what it was contractually obligated to spend.  (Doc.

116, p. 20.)  However, the RAA does not obligate SST to meet its marketing spend

in a certain manner or with certain evidentiary proof.  (Doc. 116-1, p. 8.)  If SST

seeks to prove that it met the spend requirement by providing exclusively

testimonial evidence, SST may do so.  CD will have the opportunity to cross

examine those witnesses and address any lack of documents supporting or

corroborating their testimony.  Accordingly, because there are genuine issues of

material fact with respect to the element of breach, CD is  not entitled to judgment

as a matter of law on its breach of contract claim.  CD's motion for summary

judgment will be denied.

The court will not address SST's arguments regarding whether CD has

established that it is entitled to damages, because there are disputed issues of fact

regarding liability and because these arguments were not contained in SST's

affirmative motion for summary judgment.  Arguments regarding what type of

damages are available as a matter of law may be raised in pre-trial motions or at

trial.

## CONCLUSION

In conclusion, CD's motion for partial summary judgment is denied.  SST's

motion for summary judgment is granted in part and denied in part.  An Order

follows.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Judge
Middle District of Pennsylvania

Dated: May 12, 2025