IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CITIZEN DEVELOPER, LLC, | : | Civil No. 1:23-CV-00564 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| SYSTEM SOFT TECHNOLOGIES, INC., | : | |
| | : | |
| | : | |
| Defendant. | : | Judge Jennifer P. Wilson |

## MEMORANDUM

Before the court are a total of twelve motions in limine filed by Plaintiff Citizen Developer, LLC, ("CD") and Defendant System Soft Technologies, Inc., ("SST").  CD filed eight motions in limine.  (Docs. 148, 151, 153, 162, 164, 166, 174, 191.)  SST filed four.  (Docs. 217, 219, 221, 223.)  For the reasons explained herein, CD's motions in limine will be granted in part and denied in part, and SST's motions in limine will be granted in part and denied in part.

## BACKGROUND

A jury trial in this matter is scheduled to begin on Monday, April 6, 2026. Three claims will be tried.  (Doc. 144, p. 7.)  First, CD claims that SST breached a Reseller Appointment Agreement ("RAA") the parties executed.  (Doc. 12, ¶¶ 47–57.)  Second, in a counterclaim, SST alleges CD breached the RAA.  (Doc. 56, ¶¶ 23–28.)  Third, SST raises a counterclaim of tortious interference with a

1

contractual relationship.  (*Id.* ¶¶ 43–48.)  The twelve motions in limine the parties filed are ripe for disposition.[1]

STANDARD OF REVIEW

The parties' motions in limine raise several different types of arguments to which different legal standards apply.  Accordingly, the court provides a general explanation of each of the applicable legal standards before discussing their applicability to the parties' motions.

### A. Motions in Limine and Relevance

Prior to trial, courts may rule on motions in limine involving the admissibility of evidence.  Such motions "narrow the evidentiary issues for trial and . . . eliminate unnecessary trial interruptions."  *Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1069 (3d Cir. 1990).  Yet, they also "often present issues for which final decision is best reserved for a specific trial situation."  *Regassa v. United States*, 613 F. Supp. 3d 880, 884 (M.D. Pa. 2020) (quoting *Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 518 n.10 (3d Cir. 1997)).  In such circumstances—and especially where the motion "encompasses broad classes of evidence"—a court should defer ruling "until trial to allow for the resolution of

---

[1] Because the parties filed these motions in limine in preparation for trial, and because the court writes this memorandum for the parties, the court omits a recitation of the facts of the case.  The court's memorandum opinion resolving the cross motions for summary judgment in this case, Doc. 144, contains a detailed recitation of the facts and the parties' disputes in this case.  (Doc. 144, pp. 2–8.)

2

questions of foundation, relevancy, and potential prejudice in proper context." *Id.* (quoting *Leonard v. Stemtech Health Scis., Inc.*, 981 F. Supp. 2d 273, 276 (D. Del. 2013)).  Thus, "a trial court's ruling on a motion in limine is subject to change when the case unfolds . . . ." *United States v. Larry*, 537 F. Supp. 3d 766, 768 (M.D. Pa. 2021) (quoting *United States v. Tartaglione*, 228 F. Supp. 3d 402, 406 (E.D. Pa. 2017)) (internal quotation marks omitted).

The court should only exclude evidence when that evidence is "clearly inadmissible on all potential grounds." *Tartaglione*, 228 F. Supp. 3d at 406 (citing *Leonard*, 981 F. Supp. 2d at 276).  "The movant bears the burden of demonstrating that the evidence is inadmissible on all potential grounds." *Heckman v. N. Penn Comprehensive Health Servs.*, No. 4:20-CV-01680, 2025 WL 3015790, at *1 (M.D. Pa. Oct. 28, 2025) (quoting *United States v. Ramsey*, No. 19-628, 2021 WL 4554642, at *2 (E.D. Pa. Oct. 5, 2021)).  A district court's evidentiary rulings are normally reviewed for abuse of discretion. *United States v. Womack,* 55 F.4th 219, 234 (3d Cir. 2022) (citing *United States v. Green*, 617 F.3d 233, 239 (3d Cir. 2010)).

Generally, relevant evidence is admissible at trial.  Fed. R. Evid. 402. Evidence is relevant if: "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401.  The court, however, may preclude

relevant evidence from trial where its "probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. "The Federal Rules of Evidence embody a strong and undeniable preference for admitting any evidence having some potential for assisting the trier of fact." *Holbrook v. Lykes Bros. Steamship Co., Inc.*, 80 F.3d 777, 780 (3d Cir. 1996) (cleaned up).

### B. Federal Rule of Evidence 701—Lay Witness Opinion Testimony

Federal Rule of Evidence 701 governs when a lay witness may testify in the form of an opinion at trial. Pursuant to that rule, a lay witness may only testify to an opinion that is:

(a) rationally based on the witness's perception;

(b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and

(c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701. The rule requires that the witness's perception "provide a truly rational basis for his or her opinion," and for an opinion to be helpful, it must also be reasonably reliable. *Pruette v. Egan-Jones Ratings Co.*, No. CV 18-3734, 2024 WL 2092981, at *5 (E.D. Pa. May 9, 2024) (quoting *Asplundh Mgf. Div., a Div. of Asplundh Tree Expert Co. v. Benton Harbor Eng'g*, 57 F.3d 1190, 1201 (3d Cir.

4

1995)).   And "a person may testify as a lay witness only if his opinions or inferences do not require any specialized knowledge and could be reached by any ordinary person." *United States v. Kale*, 445 F. App'x 482, 485 (3d Cir. 2011). The witness's testimony must not "too closely resemble[] the sort of complex, hypothetical speculation characteristic of expert testimony." *Pruette*, 2024 WL 2092981, at *5 (quoting *Acosta v. Cent. Laundry, Inc.*, 273 F. Supp. 3d 553, 556–57 (E.D. Pa. 2017).

## C. Federal Rule of Evidence 702 and the *Daubert* Standard—Expert Testimony

Federal Rule of Evidence 702 governs the admission of expert witness testimony.   Pursuant to that rule:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.   Thus, "[d]istrict courts are tasked with a rigorous gatekeeping function to ensure that 1) the expert is qualified; 2) the proposed testimony is

5

reliable and concerns matters requiring scientific, technical, or specialized knowledge; and 3) the expert's testimony is sufficiently tied to the facts of the case, so that it fits the dispute and will assist the trier of fact." *Cohen v. Cohen*, 125 F.4th 454, 460 (3d Cir. 2025) (quoting *Elcock v. Kmart Corp.*, 233 F.3d 734, 744 (3d Cir. 2000); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993) and then citing *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 832 (3d Cir. 2020)) (internal quotation marks, citations and alterations omitted). "The proponent of expert testimony has the burden of establishing its admissibility by a preponderance of the evidence." *VanDine v. Summit Treestands, LLC*, 738 F. Supp. 3d 599, 610 (E.D. Pa. 2024) (citing *In re TMI Litig.*, 193 F.3d 613, 705 (3d Cir. 1999)); *Broe v. Manns*, No. 3:15CV985, 2016 WL 7048988, at *2 (M.D. Pa. Dec. 5, 2016) (citing *Daubert*, 509 U.S. at 593).

Nonetheless, Rule 702 "has a liberal policy of admissibility." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008) (quoting *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997)). "The overriding consideration with regard to these three requirements is that expert testimony should be admitted if it will assist the trier of fact." *Tyger v. Precision Drilling Corp.*, 832 F. App'x 108, 112 (3d Cir. 2020) (citing *United States v. Velasquez*, 64 F.3d 844, 850 (3d Cir. 1995)). In performing this gatekeeping function, a district

court "exercises discretion when deciding whether to admit or deny expert testimony." *F.E.I. Co. v. United States*, 409 F. Supp. 3d 306, 315 (M.D. Pa. 2019) (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146–47 (1997)).

### D. Federal Rule of Evidence 1006—Summaries Offered to Prove Content

Federal Rule of Evidence 1006 governs the admissibility of documents summarizing information that are offered as proof of the content they contain. The rule states that "[t]he court may admit as evidence a summary, chart, or calculation offered to prove the content of voluminous admissible writings, recordings, or photographs that cannot be conveniently examined in court, whether or not they have been introduced into evidence." Fed. R. Evid. 1006(a). Moreover, the "proponent must make the underlying originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court." Fed. R. Evid. 1006(b). When calculations contained in the summary "go beyond the data they summarize and include several assumptions, inferences, and projections then the proposed evidence is subject to the rules governing opinion testimony." *Ariana World Wide Shipping LLC v. Ariana Worldwide USA, Inc.*, No. 24-1441, 2025 WL 1419718, at *2 (3d Cir. May 16, 2025) (quoting *Eichorn v. AT&T Corp.*, 484 F.3d 644, 650 (3d Cir. 2007) (internal quotation marks and alterations omitted). And it "is well established that summary evidence is admissible under Rule 1006 only if

7

the underlying materials upon which the summary is based are admissible."

*United States v. Pelullo*, 964 F.2d 193, 204 (3d Cir. 1992) (collecting cases).

**DISCUSSION**

Both CD and SST move to exclude various categories of evidence on several different grounds. The court addresses each motion in limine in turn, saving its discussion of the parties' three motions to exclude expert testimony pursuant to Federal Rule of Evidence 702, Docs. 151, 174, and 217, for last.

**A. The court will grant in part and deny, without prejudice, in part CD's motion to exclude unproduced documents and testimony relying on those documents, Doc. 148.**

CD's first motion in limine requests that the court exclude documents SST allegedly failed to produce during discovery and any SST witness testimony about information contained within the allegedly unproduced documents. (Doc. 148-2, pp. 1–3.)[2] During the discovery process, the court ordered SST to produce a series of documents to CD. (*See* Docs. 89, 98.) These documents included SST employee calendars, budget and expenditure documents for marketing the CD platform, electronic store information, marketing reports and documents specific to SST's marketing of CD's platform, marketing rollups, reports, and documents, and notes from SST's "tallying meetings." (Doc. 149, pp. 1–3 (listing these categories

---

[2] For ease of reference, the court uses the page numbers from the CM/ECF header.

of documents, specifically); Doc. 89, pp. 1–7; Doc. 98, pp. 1–4.)  The court

ordered that:

> <u>If</u> any document or thing ORDERED to be produced herein above and/or by this Court's Order of March 20, 2024 (Dkt. #89) ever existed and SST determines that for <u>any</u> reason any such documents <u>no</u> longer exist, SST must provide the Court and CD a detailed explanation, in writing, as to why any such document/thing no longer exists, when, how, why and by whom or what each was deleted, destroyed, discarded or otherwise made not to exist.

(Doc. 98, p. 3.)  The court also ordered that any document SST failed to produce as

required would be inadmissible at trial.  (*Id.* at 4.)  CD avers that SST failed to

produce numerous documents listed in the court's orders, and that SST's witnesses

reviewed and will rely on unproduced documents when they testify at trial based

on their deposition testimony.  (Doc. 149, pp. 5–6, 9 ("SST wants to conceal the

Ten Tools documents from CD, the Court and Jury, yet to have its employees

testify about their content and render opinions on it.")  Moreover, it claims that

SST failed to provide any explanation for the missing documents in defiance of the

court's order.  (*See id.* at 7.)  And to the extent it attempted to explain why it could

not access data from third-party tools it used, CD argues that its explanations are

unpersuasive.  (*Id.* at 8–9.)  It also claims that SST failed to provide documents

relevant to its counterclaims despite the court's orders.  (*Id.* at 10.) Although SST

produced some documents after the court's orders, CD argues that these documents

are not fully responsive and many are irrelevant.  (*Id.* at 12–13.)

CD argues that, pursuant to Federal Rule of Civil Procedure 37(c), the court should sanction SST by prohibiting the admission of unproduced documents at trial and prohibiting:

> SST, its lawyers and its witnesses from, in any way, mentioning, relying on or arguing about the existence of and/or content of any such "ordered/not produced" documents and that no document or testimony which in any way relies upon, summarizes, refers to, or cites any such unproduced document shall be admissible for any purpose in this case, including Trial.

(*Id.* at 14.)  In opposition, SST first notes that it "generally agrees with the premise that it may not rely on evidence not produced and agree[s] to concede to that position."  (Doc. 159, p. 6.)  However, it argues that it "has complied with all discovery requests and orders to the extent it is capable," and if the court granted CD its requested relief, it would "eliminate" SST's ability to present evidence.  (*Id.* at 7.)  But it again agrees that "no evidence which has not been properly produced will be used at trial."  (*Id.*)

Next, SST explains that it has produced all of the requested documents in its possession to CD, but it avers that it lost access to some documents CD seeks or never created certain types of documents in the first place.  (*Id.* at 7–11.)  SST claims that "not possessing a particular type of evidence should not preclude [its] witnesses from testifying to their personal knowledge of SST's marketing efforts . . . ."  (*Id.* at 9.)  It denies that it intentionally destroyed or failed to withhold relevant evidence or documents.  (*See id.*)

10

In reply, CD reiterates that "to the extent that any SST witness testimony uses, utilizes or relies on the content of any unproduced document, such testimony is . . . inadmissible." (Doc. 179 at 3.) Then, CD argues that SST has still failed to comply with the court's order to explain the absence of certain requested documents and points out perceived flaws in the explanation SST does provide. (*Id.* at 3–9.) It also argues that some of the documents SST produced and avers are responsive are, in fact, not responsive at all. (*Id.* at 6–7 (discussing the purported employee calendars SST produced).) Next, it argues that SST failed to comply with litigation holds and other obligations that compelled it to retain specific data it now claims is lost. (*Id.* at 9–13.) It claims that its proposed order is properly limited, and that "sanctions are even more appropriate now." (*Id.* at 10–11.)

The court will grant CD's motion in part. SST may not seek to admit as evidence at trial any document that it failed to produce to CD during discovery. The court will deny CD's motion without prejudice as to the other forms of relief it requests and, for now, will not address CD's request for additional sanctions. CD is free to renew the objections to testimony during trial, when the court has the benefit of additional context and the evidentiary question before it is limited to a discrete issue about a particular witness's testimony. *See Regassa* 613 F. Supp. 3d at 884. The court appreciates that CD's motion alerted the court to the need for

11

close evidentiary review of testimony that may be based on a witness's review of unproduced documents should that issue arise at trial.

### B. The court will deny CD's motion to exclude SST's "summary documents," Doc. 153, without prejudice.

CD's third motion in limine, Doc. 153, seeks exclusion of five "summaries" that SST attached as exhibits to its opposition to CD's motion for partial summary judgment.  (Docs. 132-7, 132-13, 132-14, 132-14, 132-15, 132-16.)  CD claims these documents are "obviously summaries of a substantial amount of other data/information from other documents/things/computer storage," so they must meet the requirements of Rule 1006 before the court admits them.  (Doc. 154, pp. 2–3.)  CD identifies the following issues with the purported summaries: SST failed to produce all the documents on which the summaries are based; the calculations displayed in the summaries are incorrect; other information in the summaries is incorrect; and in one case, the summary includes a heading that is not part of the underlying documents.  (*Id.* at 3–5.)  Next, it claims SST fails to lay a proper foundation for each summary, does not demonstrate that the information summarized is voluminous, the summaries do not accurately reflect the data and documents on which they are based, SST did not produce the underlying documents during discovery, SST has not shown that the underlying documents are admissible, and the summaries contain improper argument, characterizations, opinions, and conclusions.  (*Id.* at 4–9.)  Finally, CD argues that SST's lay

witnesses should not be allowed to testify as to the information presented in the summaries because SST did not produce the data and documents they summarize. (*Id.* at 9.)

In opposition, SST first argues that on a motion in limine, it is CD's burden to prove that the evidence it seeks to exclude is inadmissible on all potential grounds. (Doc. 161, p. 5.)  It claims CD should raise this objection when and if SST attempts to admit the summaries at trial.  (*Id.*)  Next, SST claims that documents 132-13, 132-14, and 132-15 are not summaries, they are direct data exports from SST's timekeeping system.  (*Id.* at 7.)  Then, it argues that even if the documents at issue are summaries, Rule 1006 does not apply because only summaries that are created in preparation for litigation are covered by that rule, and these documents were created in the ordinary course of business.  (*Id.* at 8–12.)  As for document 132-16, SST argues that even if that document qualifies as a summary subject to Rule 1006, it meets the requirements of that rule because SST produced the underlying documents to CD and the data expressed therein is accurate.  (*Id.* at 11–13.)

In reply, CD contends that no binding authority limits Rule 1006's applicability to summaries prepared or created for litigation purposes, but even so, SST created the documents in dispute in preparation for litigation, and whether they also qualify as "business records" is of no moment to the court's analysis.

13

(Doc. 183, pp. 1–6.)  CD argues that the summaries contain multiple errors that make them inadmissible.  (*Id.* at 4–6.)

The court will deny CD's motion in limine to exclude admission or reliance on the disputed summaries, Docs. 132-7, 132-13, 132-14, 132-14, 132-15, 132-16, without prejudice.  To the extent these documents are summaries contemplated by Rule 1006, SST will need to satisfy the requirements of that rule to admit these documents into evidence at trial.  If and when SST attempts to admit any of these documents at trial, CD may renew its objection.  The court will then decide the evidentiary issue presented by CD's objection with the benefit of SST's attempt to lay a foundation for the document.

### C. The Court will Deny CD's Motions to Exclude the Testimony of SST's "Lay Opinion" Witnesses, Docs 162, 164, 166, Without Prejudice.

CD's fourth, fifth, and sixth motions in limine seek to exclude testimony from Eric Leonard, Calvin Fuerst, and Ashok Yarlagadda, respectively.  (Docs. 162, 164, 166.)  Leonard, Fuerst, and Yarlagadda (collectively, "the SST employees" or "the lay opinion witnesses") are current or former SST employees. (Doc. 163, p. 1.)  SST attached partial transcripts of each employee's deposition testimony to its brief in opposition to CD's motion for partial summary judgment. (*Id.* at 1–2.)  CD seeks to exclude their testimony at trial because it argues that SST will produce them as lay witness testifying in the form of an opinion, and their

14

testimony will not satisfy the criteria set forth in Federal Rule of Evidence 701. (*See id.* at 2.)  CD argues that the  SST employees' testimony should be excluded because they are based on inaccurate, just-created, or inadmissible evidence, their testimony is based on documents SST failed to produce to CD during discovery, they have no personal knowledge of the relevant facts of the case to support their opinions, their opinions are merely disguised expert opinions, and their opinions express a mere subjective belief.  (*See* Doc. 163, pp. 2–3.)  The court summarizes the parties' witness-specific arguments in turn.

### 1.  Leonard, Doc. 162

CD alleges that Leonard fabricated timekeeping data, he relied on unproduced documents in offering his opinion, and his opinion expresses technical judgments beyond the scope of Rule 701.  (*Id.* at 4–16.)

In opposition, SST claims that Leonard testified in his deposition that, when he worked for SST as the head of its "delivery" team for the CD platform, he calculated SST's marketing spend on a spreadsheet that SST produced to CD during discovery.  (Doc. 176, p. 3.)  Thus, SST claims Leonard is not offering an opinion, he is merely laying a foundation for the admission of an SST business record.  (*Id.* at 4.)  Yet SST also argues that even if Leonard's testimony qualifies as lay opinion testimony, it meets all the requirements of Rule 701 because he will testify about a record he drafted based on data he collected, it helps the jury

15

understand SST's marketing spend, and it exhibits simple arithmetic, not specialized calculations or knowledge.  (Doc. 176, pp. 1–7.)  It argues that if Leonard failed to cite supporting documentation in his testimony, that would go to the issue of his credibility, not the general admissibility of his entire testimony.  (*Id.* at 7–8.)  Finally, it argues that any objection CD raises about hearsay is premature at this juncture.  (*Id.* at 8.)

In reply, CD argues that SST, for the first time, states that it may rely on the entirety of Leonard's deposition testimony at trial.  (Doc. 186, p. 1.)  It recognizes that he is not an expert witness, then argues that even if Leonard has "personal knowledge" about the contents of unproduced documents, he may not testify about them.  (*Id.* at 1–3.)  Next, it argues that the testimony the employees expressed in their depositions is inaccurate regardless of its admissibility.  (*Id.* at 3–7.)

### 2. Fuerst, Doc. 164

CD argues that Fuerst's testimony should be excluded because it relies on unproduced documents and inadmissible evidence, does not explain how he calculated specific figures about which he testifies, he testifies as to future projections and not actual expenditures, and he generally fails to meet the requirements of Rule 701 by failing to testify about his own personal knowledge and providing nothing helpful to the jury.  (Doc. 165, pp. 1–4.)  In opposition, SST argues that it has produced marketing spending records to CD, that his testimony

16

will be based on personal knowledge of SST's business operations and not hearsay, that his testimony does not express an opinion, and even if it does express an opinion, Fuerst's testimony satisfies the requirements of Rule 701. (*Id.* at 1–12.)

In reply, CD again notes that Fuerst is not an expert and that SST, for the first time, purports to rely on the entirety of Fuerst's testimony as stated in his deposition transcript. (Doc. 187, p. 1.) It reiterates that Fuerst's testimony about SST's marketing budget is irrelevant here because a budget says nothing about actual expenditures. (*Id.* at 2.)

### 3. Yarlagadda, Doc. 166

As for Yarlagadda, CD argues that his testimony should be excluded pursuant to Rule 701 because he does not have personal knowledge about the information that forms his testimony, his testimony is not helpful to the jury, he does not identify specific documentary evidence on which his testimony is based, and he makes unsound estimates without citing to supporting evidence. (Doc. 167, pp. 1–5.)

In opposition, SST claims that the points raised in CD's motion are better left for cross examination because Rule 701 only requires that a lay opinion witness's testimony be based on their personal perception, there is no requirement that a witness cite to specific documentary support under that rule, and even if Yarlagadda qualifies as an expert witness, he may state his opinions and give the

17

reasons for it without explaining the underlying facts or data unless questioned on cross examination.  (Doc. 178, pp. 4–6.)  Moreover, SST claims that Yarlagadda's testimony will satisfy the requirements of Rule 701 because, as SST's chief information officer, he has personal knowledge of the company's offerings and its marketing spend in a year.  (*Id.* at 7–9.)  It avers that his testimony is helpful because it explains information not found in SST's records.  (*Id.* at 9–10.)  And finally, it claims Yarlagadda's testimony does not present a sophisticated or technical analysis because it is "nothing more than a straightforward calculation of the amount of SST's marketing expenditures which is attributable to the CD Platform."  (*Id.* at 11.)

In reply, CD again notes that SST newly relies on the entire transcript of Yarlagadda's testimony and challenges the accuracy of his testimony.  (Doc. 188, p. 1.)

The court will deny CD's motions in limine seeking to exclude the "lay opinion" testimony from Leonard, Fuerst, and Yarlagadda, Docs. 162, 164, 166, without prejudice.  SST suggests that at least one of these witnesses will be presented for the purpose of authenticating a document, not offering an opinion.  (Doc. 176, p. 4.)  Moreover, it is not yet clear which, if any, of the topics covered during the depositions of Leonard, Fuerst, and Yarlagadda will be addressed through trial testimony elicited by SST.  Accordingly, the court will benefit

18

considerably from the additional context provided by trial, and CD may make specific objections to evidence or testimony it wishes to challenge when that evidence is presented at trial. *See Tartaglione*, 228 F. Supp. 3d at 406 ("A trial court considering a motion in limine may reserve judgment until trial in order to place the motion in the appropriate factual context.") (citing *Diehl v. Blaw–Knox*, No. 01-0770, 2002 WL 34371510, at *1 (M.D. Pa. July 15, 2002).

### D. The Court will Deny CD's Motion in Limine that Seeks Admission of Evidence Related to Breaches that Occurred and Damages it Accrued in 2024, Doc. 191.

CD's next motion in limine asks the court to rule on the "admissibility of SST's breach of the RAA and CD's Damages for the Calendar Years of 2021, 2022, 2023 *and* 2024." (Doc. 191; Doc. 192, p. 1.) This motion hinges on an interpretation of certain language in the RAA. (Doc. 192-1.)

The RAA defines the "term" of the agreement as beginning "on the Effective Date" and ending "on the third anniversary of the Effective Date." (*Id.* at 6.) The RAA's effective date is March 30, 2021. (*Id.* at 3.) Section 2.6 is the portion of the RAA relevant to CD's breach of contract claim. (*Id.* at 9.) That section states that "during the Term, it shall expend no less than $240,000 per calendar year on marketing the Platform in the form of content, webinars, speaking appearances, and campaigns directly in support of the Platform." (*Id.* at 9.) Relying on the term "calendar year," CD interprets the Section 2.6 provision to

19

mean that SST had to spend at least $240,000 marketing CD's platform per year for each of the following four years: 2021, 2022, 2023, and 2024.  (Doc. 192, p. 1.)  Thus, CD argues, it is entitled to present evidence about "SST's Breach and CD's Damages incurred for all Four Calendar Years – 2021, 2022, 2023 *and* 2024."  (*Id.* at 3.)

In opposition, SST first argues that CD already admitted that it is only seeking damages for three years and that the total figure SST had to spend on marketing CD's platform pursuant to the RAA is $720,000.  (Doc. 193, p. 2.)  Thus, CD's "judicial admissions" require the court to deny its motion.  (*Id.*)  Next, SST argues that the court should deny CD's motion because it does not seek to exclude or admit specific evidence, so it is too broad to resolve pretrial.  (*Id.* at 4–6.)  Second, it claims that any arguments or evidence related to an RAA breach or CD's damages in 2024 are irrelevant as a matter of law.  (*Id.* at 6.)  This is because, even if the RAA obligated SST to spend $240,000 on marketing CD in 2024, CD released SST from that obligation when it sent SST a notice of termination of the contract in October 2023.  (*Id.* at 6–8.)  Third and finally, it avers that CD's interpretation of the term "calendar year" is incorrect; the term "calendar year" is ambiguous, and when that term is read in context, it is clear that the RAA requires that SST meet the marketing spend requirement for each of the *three* years that elapsed between the RAA execution date and its expiration date.  (*Id.* at 9–11.)

20

In reply, CD first argues that its motion need not seek to exclude or admit specific evidence as SST argues.  (Doc. 196, p. 1.)  Second, it avers that it never judicially admitted that the RAA obligated SST to meet the marketing spend requirement in § 2.6 for only three years instead of four.  (*Id.* at 2–4.)  Third, it claims that the terms of the contract are not ambiguous and support its four-year interpretation.  (*Id.* at 4–10.)  Fourth, it argues that even if the court finds the term "calendar year" to be ambiguous, evidence beyond the terms of the contract confirm its reading of that term.  (*Id.* at 10–12.)  Fifth and finally, CD argues that the "legal significance" of the contract termination notice CD sent to SST is not at issue here.  (*Id.* at 11–14.)  That is because the court would need to weigh in on various fact issues to determine whether CD properly terminated the contract and whether that termination relieved SST of its contractual obligations.  (*Id.* at 12.)  CD confines its motion to the question of contract interpretation it originally posed, and claims that SST may argue about the impact of the termination notice at trial.  (*Id.* at 12–14.)

The court's discussion of CD's motion begins with an explanation of the limits of its analysis.  First, the court agrees with CD's proposed limitations, and will not address the issues of whether CD's termination notice (1) terminated the RAA on a specific date or (2) precludes CD from offering evidence about its damages in 2024 because the termination notice ended SST's obligations under the

contract.  (Doc. 193, pp. 6–8.)  The court agrees that addressing these issues would involve consideration of factual questions and is outside the scope of CD's motion.

Second, the court interprets CD's motion as posing the following two questions: (1) does the term "calendar year" as it is used in § 2.6 of the RAA mean a period of twelve months from January to December, specifically, or does it mean the 365-day interval between each anniversary of the RAA's execution date?; and (2) if the former is the unambiguous plain meaning, may SST object to the introduction of evidence relating to damages and breach from the year 2024 by arguing that the RAA's plain terms required it to meet the marketing spend requirement for only three years, rather than four years including 2024?

Third, at this stage, the court can only answer the first question if it finds that the term "calendar year" is unambiguous and can only match one of the two definitions.  That is because "if a contract's terms are unambiguous, courts apply the plain meaning rule and assume that the intent of the parties to a written contract is contained in the writing itself." *Jones v. E. Air Holdings, Inc.*, No. CV 23-06, 2025 WL 2778091, at *3 (E.D. Pa. Sept. 26, 2025) (citing *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 613 (3d Cir. 1995)).  But "[i]f a text is ambiguous, interpretation is a question for the trier of fact." *Id.* (citing *Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 390 (Pa. 1986)); *see also Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.*, 619 F.2d 1001, 1011 n.10 (3d Cir. 1980); *Kripp v.*

*Kripp*, 849 A.2d 1159, 1163 (Pa. 2004) ("While unambiguous contracts are interpreted by the court as a matter of law, ambiguous writings are interpreted by the finder of fact.")[3]

Thus, the court may only resolve the questions posed by CD's motion if the terms of the contract are unambiguous. "Under Pennsylvania law, 'a contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense.'" *In re Somerset Reg'l Water Res., LLC*, 949 F.3d 837, 845 (3d Cir. 2020). Ambiguity may be patent or latent: "[a] patent ambiguity is one that is apparent on the face of the document, and a latent ambiguity is 'created by extrinsic or collateral circumstances.'" *Patel v. Dhaduk*, 839 F. App'x 715, 718 (3d Cir. 2020).

Here, the court finds that the term "calendar year," standing alone, is ambiguous by its plain meaning. "Calendar year" is defined as either "a period of a year beginning and ending with the dates that are conventionally accepted as marking the beginning and end of a numbered year" or "a period of time equal in length to that of the year in the calendar conventionally in use." *Calendar year*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/calendar%20year [https://perma.cc/7QXB-9VD7] (last

---

[3] The parties argue that even if the term is ambiguous, the evidence supports their reading, despite clear precedent indicating that that determination falls to the trier of fact. (*See* Doc. 193, p. 10, Doc. 196, p. 11.)

visited Mar. 30, 2026).  And as demonstrated by the parties' arguments about the meaning of the term in the context of § 2.6 of the RAA and the RAA as a whole, neither interpretation is unreasonable.  (Doc. 193, pp. 8–11; Doc. 196, pp. 7–11.)

Accordingly, whether the RAA required SST to meet the marketing spend requirement in 2024 depends on the jury's determination of the meaning of the terms of the contract, so the court cannot grant CD relief on the theory that the RAA marketing spend requirement did or did not extend to 2024.  Moreover, to the extent CD is seeking a pretrial ruling that an unraised objection to as-yet unoffered evidence is overruled, the court cannot make that determination because the jury must ultimately determine both the meaning of the contract and any amount of damages.[4]  Accordingly, the court will deny CD's motion for "a determination of the admissibility of SST's breach of the RAA and CD's Damages for the Calendar Years of 2021, 2022, 2023 and 2024." (Doc. 191, p. 1.)[5]

---

[4] In light of this ruling, and because the jury will be entrusted with determining the meaning of the RAA's terms, it is possible that evidence may be admissible for a time period the jury may ultimately conclude is foreclosed by their factual determination of the meaning of the contract. Accordingly, the court suggests that an instruction should be given to guide the jury's consideration of such evidence.

[5] To be clear, this ruling does not mean that CD may not attempt to admit the evidence discussed in the motion.  It just means that the court cannot rule on the hypothetical objection that CD assumes that SST will pose at this stage.

24

**E. The Court will Deny SST's Motion in Limine Seeking to Exclude Evidence That any Breach of Contract Occurred Other Than the Breach of § 2.6 of the RAA, Doc. 219, Without Prejudice.**

CD's breach of contract claim alleges that SST breached the parties' RAA by failing to adhere to the "Marketing Spend requirement" found in § 2.6 of the RAA. (Doc. 12, ¶ 49.) SST's second motion in limine seeks to prevent CD from arguing or suggesting to the jury that SST breached any portion of the RAA apart from the marketing spend requirement described in § 2.6, or that SST broke any other unwritten "promises" between the parties in connection with the agreement. (Doc. 220, pp. 1–5.) SST notes that the RAA contains an integration clause and cannot be amended without a signed writing. (*Id.* at 2–3.) And it explains that CD's amended complaint included other allegations relating to the RAA in claims that have since been dismissed and argues that CD should not be able to renew those arguments now. (*Id.* at 3–5.) SST cites CD's briefing on other motions in which it clarified that its breach of contract claim is based only SST's alleged violation of § 2.6 of the RAA. (*Id.* at 3.)

In opposition, CD first argues that SST's motion presents a relevance objection best left for trial. (Doc. 231, p. 1.) Then, it claims that this issue is moot because it has already limited its breach-of-contract claim to § 2.6. (*Id.* at 2.) Nonetheless, it opposes SST's motion because although some of SST acts and omissions unrelated to § 2.6 are not the basis of its breach of contract claim, they

are relevant "to CD's remaining Breach of Contract Claim and will be used as evidence at trial." (*Id.*)  And it argues that SST's other breaches of the contract are affirmative defenses to SST's counterclaims.  (*Id.*)

In reply, SST argues that the court need not wait for trial to resolve its motion in limine.  (Doc. 249, p. 3.)  It reiterates that CD limited its breach of contract claim to § 2.6, only, and then claims that:

> CD has argued that its defense to this counterclaim is that SST breached the RAA first. But as discussed *supra*, the parties agree that the sole basis for CD's breach of contract claim is SST's alleged failure to satisfy the Marketing Spend Obligation under Section 2.6 of the RAA. To allow CD to simultaneously argue that SST also breached other provisions of the RAA would make this previous restriction meaningless.

(*Id.* at 4.)

The court will deny SST's motion without prejudice because, although it is clear that CD's breach of contract claim is limited to § 2.6 of the RAA, the court will not order the exclusion of a broad category of potential evidence without the factual development provided by a trial.  *See Regassa*, 613 F. Supp. 3d at 884.  At trial, SST may object to CD's attempt to use specific evidence of SST's other alleged breaches, and better-developed context can inform the court's ruling. Nonetheless, it is established that CD's breach of contract claim alleges that SST breached § 2.6 of the RAA, only.

26

**F. The Court will Grant SST's Motion in Limine that Seeks to Preclude CD from Suggesting SST Violated a Court Order, Failed to Produce Documents, or Engaged in Spoliation, Doc. 221.**

In its third motion in limine, SST asks the court to prohibit CD from "using language before the jury suggesting that SST violated a court order, failed to produce documents, or engaged in spoliation." (Doc. 221-1, p. 1.)  SST argues that evidence about the discovery process should be withheld from the jury, and that evidence suggesting it failed to comply with court orders is substantially more prejudicial than probative and should therefore be excluded pursuant to Federal Rule of Evidence 403.  (Doc. 222, pp. 1–5.)

CD explains that it opposes the motion because it is a relevance objection left for trial and may impact its own motions in limine, and it argues that SST should not be allowed to use alleged discovery failures as both a sword and a shield.  (Doc. 232 p. 2.)

In reply, SST argues that prohibiting CD from making arguments about the discovery process to the jury does not impact CD's first motion in limine because that motion seeks to preclude SST from presenting testimony about specific evidence; it does not seek to present evidence of SST's alleged violations of court orders.  (Doc. 250, pp. 1–6.)

The court will grant SST's motion and prohibit CD from using language before the jury suggesting that SST violated a court order, failed to produce

27

documents, or engaged in spoliation.  Argument or evidence indicating that SST failed to comply with the court's orders or its obligations during the discovery process would be highly prejudicial if presented to the jury, and that evidence has no discernable probative value.  *See W.L. Gore & Assocs., Inc. v. C.R. Bard, Inc.*, No. CV 11-515-LPS, 2017 WL 525668, at *1 (D. Del. Feb. 8, 2017) ("It would be improper, irrelevant, unfairly prejudicial, and confusing to the jury for the parties to refer to or re-fight discovery disputes at trial.  Any minimal probative value there may be would be substantially outweighed by the countervailing concerns of Federal Rule of Evidence 403"); *Thompson v. Glenmede Tr. Co.*, No. CIV. A. 92-5233, 1996 WL 529693, at *2 (E.D. Pa. Sept. 17, 1996) ("Presenting to a jury the nuances of discovery and the "hardball" tactics employed by the lawyers may confuse the jury . . . the jury may instead be misled by the irrelevant side issues of the discovery process.  Therefore, the Court will not permit either party to refer to the discovery process in the presence of the jury at trial"); *Chinniah v. E. Pennsboro Twp.*, No. 1:08-CV-01330, 2013 WL 6054821, at *3 (M.D. Pa. Nov. 15, 2013) ("The Court cautions Plaintiffs against attempting to relitigate discovery disputes and invites Plaintiffs to seek a hearing outside of the jury's presence should a basis for a determination on spoliation arise during trial.")

If CD wishes to object to evidence or testimony based on SST's failure to produce documents on which that evidence or testimony relies or intends to raise

28

any other discovery-related issue at trial, it may do so by requesting a sidebar

conference or otherwise raising the issue with the court outside the presence of the

jury.

### G.  The Court Will Deny SST's Motion to Preclude Evidence of its Overall Size, Value, Revenue, and Profits, Doc. 223, Without Prejudice.

SST argues that evidence of its size, value, revenue, and profits should be

excluded because it is irrelevant, as this case does not involve a claim for punitive

damages.  (Doc. 224, p. 2.)  CD argues that some of SST's financial information

will be relevant to the claims at issue and that SST's request is overbroad.  (Doc.

233, p. 2.)  In reply, SST argues that CD's exhibit list shows that it will introduce

information about SST's revenues and profits, including information that SST

claims is not accurate.  (Doc. 251, pp. 1–2.)  SST expresses particular concern

about one document that portrays its revenue in an "inaccurate and misleading way

. . . ."  (*Id.* at 2.)  It fears that CD will "project a large chart for the jury to compare

SST's irrelevant total revenue to CD's revenue."  (*Id.* at 2–3.)

SST requests the exclusion of evidence related to its "size, value, revenue,

and profits."  (Doc. 223-1 at 1.)  These terms are broad, and that is concerning in a

case that will involve testimony about SST's marketing expenditures and possibly

its budgets at trial.  The court declines to grant such a sweeping exclusion without

the context of trial.  *See Regassa*, 613 F. Supp. 3d at 884.  Therefore, the court will

deny SST's motion without prejudice, and it is free to raise objections to evidence it believes falls within these categories at trial. SST will have the opportunity to object to specific evidence before CD displays such evidence to the jury, as will be explained to counsel at the pretrial conference.

### H. The Court will Deny Without Prejudice in Part and Deny in Part CD's Motion in Limine to Exclude the Testimony of SST Expert Witness Rajkumar Venkatesan, Doc. 151.

CD's second motion in limine seeks to exclude the testimony of SST expert witness Rajkumar Venkatesan. (Doc. 151 p. 1; Doc. 151-2, pp. 1–45 (displaying Venkatesan's expert report).) Venkatesan's report offers four conclusions, and the court presents an abridged version of them here:

1. SST followed standard marketing process in the business-to-business enterprise markets to promote CD.

2. SST used content marketing to establish CD as an expert in the low-code and no-code market. The distribution methods used by SST are consistent with the latest best practices in business-to-business enterprise marketing.

3. While SST has engaged in marketing activity, marketing alone is not necessary and sufficient for SST to acquire and retain customers.

4. SST faces several challenges in the no-code market that have the implication of reducing the returns from their marketing investments for promoting CD.

(Doc. 151-2, p. 20.) CD argues that Venkatesan's testimony should be excluded for several reasons. First, it argues that testimony about Venkatesan's first three

conclusions is irrelevant because SST's marketing techniques and how it retains new customers is not at issue.  (Doc. 152, p. 2.)

Second, although it agrees that Venkatesan's fourth conclusion could be relevant to damages and that the no-code market is competitive, CD argues that his testimony on those points should be excluded because it does not present exact figures about CD's market share, CD's competition, or SST's compliance with § 2.6 of the RAA.  (*Id.* at 2–3 (arguing that Venkatesan's report "says nothing" about CD's marketing, growth, or return on marketing investment (ROMI), SST's marketing, growth, or ROMI, and SST's efforts to market the CD platform).  Moreover, CD alleges that he did not review CD and SST's financial data, including actual evidence of SST's marketing expenditures.  (*Id.* at 3.)

Generally, then, CD argues that Venkatesan's expert testimony should be excluded because it fails to apply his specialized knowledge to the facts of the case in the form of, for example, a computation of alleged losses through market analysis, an explanation of how market conditions contributed to the damages claimed or an explained disagreement with CD's experts' methodology.  (*Id.* at 7.)  Thus, CD claims it challenges both the "reliability" and "fit" of Venkatesan's testimony.  (*Id.*); *Cohen*, 125 F.4th at 460.

In response, SST first argues that Venkatesan's testimony about SST's marketing process is relevant because CD alleges, in its breach of contract claim,

that SST failed to properly and ethically market CD's product. (Doc. 160, pp. 1–5.)

Second, it argues that even if CD limits its breach of contract claim to the marketing spend requirement in § 2.6 of the RAA, Venkatesan's testimony is still relevant. (*Id.* at 5.) SST claims that "one of the key remaining fact issues in the case is whether expenses recorded by SST as marketing expenses were, in fact, valid marketing expenses that are reasonably attributable to SST's marketing obligations under the contract and therefore attributable toward the amounts spent for marketing." (*Id.*) Although CD claims that Venkatesan did not review evidence of SST's marketing expenditures, SST argues that he did, and although he did not provide an exact figure of marketing expenses, his testimony will be helpful to the jury's calculation of SST ultimate marketing spend. (*Id.* at 5–6.)

Third, SST contends that Venkatesan's testimony is relevant to address CD's claim for lost profits damages. (*Id.* at 6–7.) It provides other potential causes for CD's lost profits over the relevant time period. (*Id.*)

Fourth and finally, SST claims that Venkatesan's testimony is relevant because he will inform the jury about the "technical subject matter" involved in the low-code, no-code software industry. (*Id.* at 7.) This includes explanations of the "hurdles" a company like CD faces in entering the market and "who the players are, what the software does, and how it is valued in the industry." (*Id.*)

In reply, CD first notes that it has narrowed "its Breach of Contract Claim, as explained in CD's Motion, to SST's breach of the RAA Marketing Spend Requirement *only*," so Venkatesan's first three conclusions about SST's marketing practices and how those practices attract and retain customers are irrelevant.  (Doc. 182, p. 1.)  Then, it argues that Venkatesan's report does not explain SST's marketing expenses, how SST's general expenses were allocated, or which other factors contributed to CD's lost profits, and it reiterates that "there is also no indication that Venkatesan reviewed any evidence of SST's actual *expenditures* for 'marketing the CD Platform.'"  (*Id.* at 2.)

Next, CD argues that SST is acting in bad faith by attempting to expand Venkatesan's actual conclusions after disclosing his report.  (*Id.* at 3.)  Finally, it claims that Venkatesan's testimony does nothing to help the jury determine damages and offers no reliable method for how it reached its conclusion.  (*Id.* at 4.)[6]

SST must demonstrate that Venkatesan's testimony is admissible by a preponderance of the evidence.  *Broe*, 2016 WL 7048988, at *2.  Thus, SST must show that:

---

[6] CD attempts to "incorporate[] by reference its Memorandum in Support of CD's Motion *in Limine #7* which sets forth the law on this same issue in more detail."  (Doc. 182, p. 4.)  But Middle District of Pennsylvania Local Rule 7.8 states that "[n]o brief may incorporate by reference all or any portion of any other brief."  Therefore, the court will not consider the arguments raised in CD's seventh motion in limine in ruling on this issue.

    (a) Venkatesan's scientific, technical, or other specialized knowledge will help the jury to understand the evidence or to determine a fact in issue;

    (b) his testimony is based on sufficient facts or data;

    (c) his testimony is the product of reliable principles and methods; and

    (d) his opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. CD specifically challenges Venkatesan's testimony on the basis of the criteria in subsections (c) and (d); it argues that Venkatesan's testimony is based on unreliable principles and methods and that it does not reliably apply established principles and methods to the facts of the case. (Doc. 152, p. 7 ("CD does not challenge Venkatesan's qualifications, only that his 'conclusions' are neither reliable (#4), nor 'fit,' that is, [are] relevant."))

SST must establish the reliability of Venkatesan's testimony. *VanDine*, 738 F. Supp. 3d at 610. "The expert does not have to be right," and "the evidentiary requirement of reliability is lower than the merits standard of correctness." *United States v. Anderson*, No. 25-1223, 2026 WL 835273, at *2 (3d Cir. Mar. 26, 2026). Venkatesan's report notes his extensive experience in the field of marketing, he cites specific materials relevant to the topics he discusses, and he explains how his conclusions are connected to SST and CD's marketing relationship. (Doc. 151-2, pp. 1–45.) CD appears to argue that Venkatesan's testimony is unreliable because it does not provide specific calculations or dispute the methodology of CD's

34

experts.  (Doc. 152, p. 3.)  But an opinion need not contain specific data or an outlined scientific methodology to be reliable, because "relevant reliability concerns may focus upon personal knowledge or experience."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999); *see Graham Eng'g Corp. v. Adair*, No. 1:16-CV-2521, 2021 WL 963245, at *4 (M.D. Pa. Mar. 15, 2021) ("While his opinion does not contain methodology or empirical data, we consider it the generalized type of conclusion that comes from Dr. Rauwendaal's 'personal knowledge or experience' in this specialized industry") (citing *Kumho Tire Co.* 526 U.S. at 150) ; *Meeks v. APV Ltd.*, No. CIV.A. 00-4191, 2002 WL 32348524, at *3 (E.D. Pa. Feb. 5, 2002) (admitting testimony because of the "general nature" of an engineering witness's theories, his "extensive experience as evidenced in his curriculum vitae, and the evidence of the general acceptance of his engineering principles").  Therefore, the court finds that SST has sufficiently established the reliability of Venkatesan's testimony by demonstrating his extensive experience in marketing combined with the materials he reviewed.  The fact that he does not provide a specific methodology or calculations does not render his testimony inadmissible.

Next, CD disputes, and therefore SST must establish, that Venkatesan's testimony "fits" the facts of the case and will assist the jury.  Fed. R. Evid. 702(d). The fit requirement "goes primarily to relevance," *In re Niaspan Antitrust Litig.*,

35

464 F. Supp. 3d 678, 692 (E.D. Pa. 2020) (quoting *Daubert*, 509 U.S. at 591), and "the standard for analyzing the fit of an expert's analysis for the case at hand is 'not that high,' but is 'higher than bare relevance.'" *United States v. Ford*, 481 F.3d 215, 219 (3d Cir. 2007) (quoting *In re Paoli R.R. Yard PCB Litigation,* 35 F.3d 717, 745 (3d Cir.1994)).

SST's first argument—that Venkatesan's report is admissible because of the allegations about SST's marketing practices contained in CD's breach of contract claim—does not decide the issue. (Doc. 160, pp. 1–5.) As explained above, CD has conceded and will stipulate that its breach of contract claim is limited to SST's alleged breach of § 2.6 of the RAA.

SST provides two areas of potential fit: Venkatesan's testimony about SST's marketing efforts on CD's behalf and his testimony related to potential causes for CD's lost profits. (Doc. 160, pp. 5–7.) CD primarily argues that Venkatesan's testimony is too general to fit the facts of this case, and its lack of specific damages calculations, failure to review financial data, and failure to specify a methodology[7] should result in his testimony being excluded.

---

[7] Venkatesan noted that he was "engaged to provide a review of SST's marketing process" and explained: "I have considered information from a variety of sources and shown in this report and listed in Appendix C. I also have relied upon my professional judgment and expertise, gathered from many years of marketing analysis in a variety of industries. I assumed that the information provided to me was true." (Doc. 151-2, pp. 4, 6.)

Although Venkatesan's testimony does not provide a definite calculation of SST's expenditures, it explains the specific actions SST took to market CD's product after reviewing specific material listed in his report, which may help the jury understand how SST accumulated whatever expenditures it may prove at trial. (*See* Doc. 151-2, p. 13.)  Moreover, Venkatesan's testimony is relevant to the question of CD's claim for lost profit damages.  "Under Pennsylvania law, a plaintiff may recover damages for lost profits in a breach-of-contract action only if it establishes that those damages (1) are calculable with reasonable certainty, (2) were proximately caused by the breach of contract, and (3) were reasonably foreseeable." *Fishman Org., Inc. v. Frick Transfer, Inc.*, 564 F. App'x 649, 651 (3d Cir. 2014) (citing *Delahanty v. First Pennsylvania Bank, N.A.,* 464 A.2d 1243, 1258 (Pa. Super. Ct. 1983)).  Venkatesan's report explains that CD, a company that offers a no-code software and has a small market share, could suffer lost profits due to factors other than SST's failure to comply with § 2.6 of the RAA.  (Doc. 151-2, p. 20.)  This is relevant to the issue of causation and is therefore helpful to the jury's determination of the facts.

Accordingly, the court will deny CD's motion as to Venkatesan's testimony about his fourth conclusion, which relates to potential alternate causes of CD's lost profit damages.  However, because CD will stipulate that its breach of contract claim is limited to SST's alleged violation of § 2.6 of the RAA, it will deny CD's

motion without prejudice as it relates to Venkatesan's testimony about his first three conclusions.  The court does so to allow CD to raise a relevance or "fit" objection should Venkatesan's testimony about his first three conclusions stretch beyond SST's actual marketing activities and concern the breach-of-contract allegations contained in CD's amended complaint that have since been dismissed via stipulation.

### I.  The Court will Deny CD's Motion to Exclude SST Rebuttal Expert Dominique Hanssens, Doc. 174.

In its second *Daubert* motion, CD seeks to exclude the testimony of SST rebuttal expert Dominique Hanssens.  (Doc. 174.)  SST retained Hanssens to "review and respond to the Damages Expert Report of Professor David Reibstein . . . ."  (Doc. 175-2, p. 6.) CD retained Reibstein as a damages expert.  (Doc. 218-2, p. 4.)  CD does not dispute that Hanssens is "qualified as an expert by knowledge, skill, experience, training or education."  (Doc. 175, p. 1.)  However, it claims that Hanssens's testimony does not independently satisfy the Federal Rule of Evidence 702 and *Daubert* requirements.  (Doc. 175, p. 2.)

CD first argues that although Hanssens criticizes Reibstein's methodology, Hanssens does not provide an alternative methodology or apply an alternative methodology to the facts of the case, so his testimony should be excluded.  (*Id.*)  It also argues that Hanssens's testimony does not fit in this case because his conclusions are not tied to the facts of the case.  (*Id.*)  It also claims that the court

38

should exclude Hanssens's testimony because it ignores Reibstein's rebuttal and does not provide an alternative calculation of ROMI.  (*Id.* at 4.)

CD then critiques Hanssens' four "criticisms" of Reibstein's rebuttal report in turn, generally arguing that those criticisms should not be admissible because they do not fully explain alleged flaws in Reibstein's reports, offer an alternative methodology of calculating ROMI, or apply an alternative methodology to the facts of the case.  (*Id.* at 5–6 ("An expert who simply claims that another's methodology is wrong, or numbers [']foolish,' without more, is not helpful to the jury."))  CD avers that the "key flaw" in Hanssens's critique is that it does not fundamentally dispute Reibstein's ROMI models or state that, had SST met the requirements listed in § 2.6 of the RAA, there would still be no damages.  (*Id.* at 7.)  Hanssens merely points to other factors without explaining how they would impact the ultimate calculation.  (*Id.*)

After quoting extensively from Reibstein's rebuttal expert report, CD argues that Hanssens did not base his opinions on specific facts or data because he did not review the same documents as Reibstein, Reibstein's expert report shows that Hanssens' report is not the product of reliable principles or methods, and Hanssens made no application of any methodology to the facts of the case.  (*Id.* at 8–15.)  Finally, it argues that, due to recent amendments applied to Federal Rule of Evidence 702, SST must demonstrate that Hanssens's testimony satisfies 702; the

39

inquiry does not change just because SST offers Hanssens as a rebuttal expert witness, and Hanssens must provide an alternative calculation of damages to meet the fit requirement.  (*Id.* at 15–18.)

In opposition, SST argues that Hanssens's report satisfies each of Rule 702's factors.  (Doc. 184, pp. 3–6.)  Then, SST argues that a rebuttal expert witness need not provide an alternative damages calculation to meet Rule 702's requirements.  (*Id.* at 6–8.)

In reply, CD again contends that Hanssens provides no conclusions about damages, did not examine sufficient data, and ignores parts of Reibstein's initial report.  (Doc. 189, pp. 1–3.)  It reiterates its argument that Hanssens's testimony must satisfy the requirements of Rule 702 to be admitted.  (*Id.* at 2–3.)

From CD's broad attack on Hanssens's report, the court gleans the following primary arguments: (1) Hanssens failed to examine the same data Reibstein did, rendering his opinion excludable because it is not based on sufficient facts or data; (2) Hanssens does not provide an alternative method of calculating ROMI, so his testimony is not based on reliable methodology; and (3) Hanssens did not offer an alternative damages calculation, so his testimony does not fit the facts of the case.

"Rule 702 . . . only requires that an expert's opinion be based on 'sufficient facts or data;' it does not require a review of every document or piece of information available . . . ."  *Walsh/Granite, JV v. HDR Eng'g, Inc.*, No. 2:17-CV-

40

00558-NBF, 2020 WL 13876902, at *4 (W.D. Pa. June 15, 2020).  Here, Hanssens reviewed the Reibstein report's exhibits, the Venkatesen report's exhibits, the parties' websites, and two separate depositions of a CD executive.  (Doc. 175-2, pp. 47–48.)  Hanssens cites this information when rendering his conclusions, which are primarily opinions about Reibstein's methodology.  (*See id.* at 16 n.49 (citing deposition testimony about revenue generated from sales efforts)).  Based on this review, the court finds that SST has sufficiently demonstrated that Hanssen's report relied on sufficient facts and data.

As to CD's second argument, the court finds that SST has demonstrated that Hanssens's report employs a sufficiently reliable methodology in offering an opinion on CD's damages in relation to Reibstein's estimate.  "[A]dmissibility does not hinge on . . . 'whether the opinion is supported by the best methodology or unassailable research.'"  *Cohen*, 125 F.4th at 462.  Hanssens's report cites extensive authority in support of his conclusions, Reibstein had the opportunity to rebut Hanssen's methodology, and at trial, CD's counsel may cross examine Hanssens about any inconsistency between the two expert's methods.

Finally, the court addresses fit.  "An expert's testimony 'fits' the proceedings, if it 'will help the trier of fact to understand the evidence or to determine a fact in issue.'"  *Id.* (quoting Fed. R. Evid. 702(a) and then citing *UGI*

*Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 835 (3d Cir. 2020)).

The court understands CD's argument about recent amendments to Rule 702 and the need for a rebuttal witness to meet the requirements of that rule. (Doc. 175, p. 16.)  Here, the court finds that Hanssens does meet those requirements, even without an alternative damages calculations.  Hanssen's testimony is directly related to the central issue of damages, and even if it does not provide an exact number, it will aid the jury in determining whether CD's damages are higher than, equal to, or lower than Reibstein's estimate. (*See* Doc. 175-2, pp. 6–7.)  This is relevant to the jury's determination of damages given that Hanssen's report discusses the calculation of CD's ROMI and provides factors specific to CD that could impact that ROMI. (*See id.* at 17 (explaining an absence of evidence demonstrating that all of CD's revenue was related to marketing instead of sales efforts).

For these reasons, the court finds that SST has sufficiently established the admissibility of Hanssens's testimony.  Accordingly, the court will deny CD's motion to exclude Hanssens's rebuttal testimony.

### J. The Court will Deny SST's Motion to Exclude CD Expert David Reibstein's Testimony, Doc. 217.

SST moves to exclude Reibstein's testimony pursuant to Federal Rules of Evidence 403, 702, and 703. (Doc. 217, p. 1.)  SST first provides an extended

42

summary of alleged flaws in Reibstein's testimony and calculation of damages. (Doc. 218, pp. 6–9.)  Then, it argues that the court should exclude Reibstein's testimony as speculative and unreliable because his model contemplated a 5.4-year average customer retention rate for CD and "made unreliable assumptions regarding what CD's revenue, cost, and profit might be with increased marketing spend." (*Id.* at 10.)  Next, SST claims that Reibstein's conclusions and methods contradict publications he has authored. (*Id.* at 11–13.)  After that, SST contends that Reibstein misread the facts of the case and plugged incorrect or incomplete data into his models to arrive at speculative and unreliable conclusions. (*Id.* at 13–15.)  And finally, SST argues that Reibstein did not examine another group of materials and factors, including financial projections and market effects, when arriving at his conclusions. (*Id.* at 15–17.)[8]

In opposition, CD primarily argues that Reibstein's testimony relies on sufficient and concrete data in reaching his conclusions, that the alleged flaws SST identifies in Reibstein's report are either not flaws or not fatal to the report's admissibility, and Reibstein modeled gross profit, not net profit. (Doc. 230, pp. 1–16.)

---

[8] SST also argues that the court should strike Reibstein's reply to Hanssens's rebuttal testimony. (Doc. 218, pp. 17–18.)  The court's first case management order in this case featured a deadline for both "supplemental and rebuttal expert reports." (Doc. 33, p. 1.)  Therefore, the court will deny SST's motion to strike Reibstein's reply report.

In reply, SST argues that CD admitted that Reibstein calculated CD's gross profits, not net profits, and because both "Third Circuit and Pennsylvania law are clear that a party can only recover lost net profits," CD may not recover lost profit damages as a matter of law. (Doc. 248, p. 8–9.)  Next, it argues that its expert reports explain the flaws in Reibstein's testimony, that Reibstein's report failed to consider more relevant factors, and that Reibstein relied "exclusively" on unverified information provided by CD's CEO.  (*Id.* at 11–18.)

After careful consideration of the parties' arguments, the court finds that CD has sufficiently established the admissibility of Reibstein's testimony.  SST's overarching argument for excluding Reibstein's testimony is that he relied on unverified, unreliable, or speculative data in reaching his conclusions.  But Reibstein cited to specific information attached as exhibits to his report and recognized that his conclusions could change if, for example, different information about CD's average customer retention length is provided.  (*See* Doc. 218-2, p. 16 n.47.)

Moreover, any factual issues SST presents here do not rise to the level of those at issue in *Legendary Art, LLC v. Godard*, No. CIV.A. 11-0674, 2012 WL 3550040, at *4 (E.D. Pa. Aug. 17, 2012), *Bruno v. Bozzuto's, Inc.*, 311 F.R.D. 124, 138 (M.D. Pa. 2015), and *Lithuanian Com. Corp. v. Sara Lee Hosiery*, 179 F.R.D. 450, 460 (D.N.J. 1998).  In *Legendary Art*, the expert, who was not experienced in

44

the relevant field, simply accepted profit and loss projections from the plaintiff without doing any independent investigation into those projections and used them as the "linchpin" of his valuation of the plaintiff company. *Legendary Art, LLC*, No. CIV.A. 11-0674, 2012 WL 3550040, at *3–*5; *see Bruno*, 311 F.R.D. at 138 (excluding an expert's testimony for, in part, uncritically accepting projections provided by the appointing party). And in *Lithuanian Commerce Corp.*, the court excluded an expert's testimony because of numerous unsupported assumptions, egregious inaccuracies in the data reviewed, and false equivalencies entertained by the expert in reaching a conclusion. 179 F.R.D. at 460–61. Here, Reibstein took data from the parties and created his own profit projection to reach a calculation of damages. (*See* Doc. 218-2, p. 14 n.33 & n.36.) SST can challenge the accuracy of that data, or Reibstein's choice to use certain numbers over others, on cross examination at trial. "[C]ertain surface-level flaws pertaining to methodology or data collection may be overlooked and reserved assessment of credibility" so long as the expert's evidence is not so flawed as to render it completely unhelpful to the jury. *Bruno*, 311 F.R.D. at 140. Thus, the court finds that any disagreement over the data upon which Reibstein relied may be addressed through cross examination at trial.

To the extent that SST argues Reibstein's report should be excluded for failure to consider specific facts, "Rule 702 . . . only requires that an expert's

45

opinion be based on 'sufficient facts or data;' it does not require a review of every document or piece of information available . . . ." *Walsh/Granite*, No. 2:17-CV-00558, 2020 WL 13876902, at *4.  And as for its net profits argument, even if CD may only recover lost profit damages based on evidence of net profits, it is not clear that CD can not prove net profits through testimony in addition to Reibstein's testimony at trial.  Accordingly, the court will deny SST's motion to exclude Reibstein's testimony.

### CONCLUSION

For the reasons explained herein, the court will grant in part and deny in party CD's motions in limine, and grant in part and deny in part SST's motions in limine.  An order follows.

<u>s/Jennifer P. Wilson</u>
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

Dated: March 30, 2026